MEMORANDUM AND ORDER
 

 CRONE, United States Magistrate Judge.
 

 Pending before the court is Defendant Texas A & M University (“TAMU”), Dr. James West (“West”) and Dr. Elvin E. Smith’s (“Smith”) (collectively, the “Defendants”) Motion for Summary Judgment (# 25). The Defendants seek summary judgment on Plaintiff Dr. Jackson Wagner’s (“Wagner”) claims asserting discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101
 
 et seq.
 
 (“ADA”), violations of his civil rights under 42 U.S.C. § 1983, retaliation in violation of TexGov’t Code Ann. § 554.001 (the “Texas Whistleblower Act”), negligent and intentional infliction of emotional distress, defamation, and fraudulent concealment.
 

 Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the Defendants’ motion for summary judgment should be granted in part and denied in part.
 

 I.
 
 Background
 

 Wagner is a professor in the Department of Human Anatomy and Medical Neurobiology (the “Department”) within the College of Medicine at TAMU in College Station, Texas. Wagner has been employed by TAMU since 1974 and tenured as a professor since 1976. The Department is comprised of three core subjects: Neuroanatomy, Gross Anatomy, and Microscopic Anatomy. According to Wagner, each of the subjects is a separate specialty. Wagner has focused his entire career on Neuroanatomy. Wagner acted as the Course Coordinator of Neuroanatomy at TAMU College of Medicine continuously until 1990, and then again in 1993. In addition, from 1974 to 1989, Wagner was Head of the Department at TAMU College of Medicine.
 

 Frictions in the Department began on September 16,1987, when Wagner, then Department Head, alleged that another professor in the Department, Dr. Michael Trulson (“Trulson”), had engaged in scientific fraud. According to Wagner, Trulson had plagiarized, falsified, and fabricated results of dozens of experiments as well as falsely represented himself to be a medical doctor. In response to Wagner’s allegations, Trulson allegedly accused Wagner of homosexuality and improprieties such as drug abuse, theft, fraud, and improper use of prescription medicine. Wagner requested legal assistance from TAMU to defend himself against counter-charges by Trulson, but his request was denied. Wagner contends that because Trulson was a martial arts expert, he feared violence in the office, which motivated him to carry a handgun with him to school.
 

 TAMU designated a Board of Inquiry to assess the charges made by Wagner against Trulson. On January 8, 1988, the Board of Inquiry issued a report that found Trulson had engaged in serious academic misconduct and should be terminated. TAMU submitted the report to the National Institutes of Health (“NIH”), and it was accepted by NIH. Following the report of the Board of Inquiry, TAMU and Trulson negotiated a settlement that allowed Trulson to voluntarily resign effective May 31,1988, and prevented TAMU from placing negative references in his personnel file. Wagner, who had hired Trulson, continued to press for broader inquiry into and disclosure of the allegations and findings of misconduct.
 

 In 1989, Wagner stepped down as Department Head. The circumstances of his resignation are a matter of considerable debate. Wagner contends that he was forced out because of his frequent demands for greater disclosure of the “Trulson Affair.” The Defendants claim that Wagner left voluntarily because he had been neglecting his Department Head duties and lacked the support of the Department. According to Wagner, Richard DeVaul (“DeVaul”), then Dean of the College of Medicine, promised Wagner $80,000 in start-up research funds as an off
 
 *1306
 
 set for being required to step down as Department Head. Wagner never received these funds.
 

 Wagner continued to object to TAMU’s failure to pursue Trulson aggressively. As a result, officials at TAMU met with Dr. Suzanne Hadley (“Hadley”) at the Office of Scientific Integrity (“OSI”), an investigative arm of the NIH, at which time TAMU and NIH jointly determined to reopen the Trulson investigation. On November 8, 1989, TAMU appointed an Investigation Committee to complete the investigation of the allegations made by Wagner. The Investigative Panel was formally charged on October 16, 1989. In March 1990, the committee issued a report (the “Norris Committee Report”) which found that Trulson had committed serious academic misconduct. The Norris Committee Report recommended, among other things, that various funding and publication organizations that Trulson had worked with be notified of the findings of misconduct, that Trulson be barred from receiving NIH funds in the future, and that Trulson’s personnel records at TAMU include the findings of the Panel.
 

 In 1991, Wagner took a sabbatical. Wagner contends that when he returned from sabbatical, he was prohibited from teaching or attending the Neuroanatomy class. Wagner therefore, instructed the University Bookstore to remove from its shelves a lab manual that he had authored on the subject of Neuroanatomy, the copyright ownership of which was later disputed. Defendant Smith, the Associate Dean under DeVaul in the College of Medicine, allegedly ordered Wagner not to remove the materials, indicating that the removal would be a breach of the terms of appointment as a faculty member,
 
 ie.,
 
 grounds for termination.
 

 On December 12, 1991, Wagner reported to the OSI that TAMU allegedly was in violation of the ethical standards designed to safeguard whistleblowers. In 1992, the Office of Research Integrity (“ORI”), the successor to the OSI, ordered TAMU to conduct an investigation into whether Wagner’s claims were well-founded. On January 14, 1993, TAMU issued the “Milford Committee Report,” which concluded that Wagner’s reputation had been damaged because of TAMU’s handling of the Trulson affair or that at least his reputation had not been protected as NIH required. The Milford Committee Report recommended that Wagner be “reintegrated” immediately and completely back into the College of Medicine. The Milford Committee Report also recommended that TAMU publish the true circumstances of the Trulson case. The ORI accepted the findings of the Milford Committee Report, and in February 1993, TAMU undertook to accomplish Wagner’s reintegration into the College of Medicine. On the issues of reintegration and research funding, TAMU Associate Provost and Dean of Faculties William L. Perry (“Perry”) was named the arbitrator between Wagner and the College of Medicine. Wagner contends that the arbitration process was a special “grievance procedure” established to implement the Milford Committee Report’s recommendations. The ORI later found this procedure to be in compliance with federal regulation and requested that it be informed when TAMU published a report of the Trulson Affair, which would close the ORI’s case file on Wagner’s retaliation claims.
 

 In 1993, Wagner again served as Course Coordinator for Neuroanatomy. In July 1993, Wagner, at the advice of his physician, requested and was granted a six-month medical leave of absence to correct certain health problems, including intermittent depression, gastrointestinal disorder, nervous and physical exhaustion, respiratory insufficiency, and lower back pain. The medical leave time was deducted from his sick leave time accumulated over the years. At the same time, Defendant West became the new Department Head.
 

 While Wagner was on medical leave and upon his return in early 1994, Perry, the arbitrator, negotiated with Wagner. During these negotiations, on April 18, 1994, TAMU offered Wagner $225,000 after taxes, plus lifetime health insurance coverage, in exchange for his immediate retirement. According to Wagner, in reliance on good faith efforts to negotiate his retirement, TAMU and Wagner agreed to his taking a one-year faculty development leave from April 1994 to
 
 *1307
 
 April 1995, during which time negotiations would continue. At the end of 1994, Defendant Smith replaced DeVaul as Interim Vice President for Health Affairs and Interim Dean of Medicine at TAMU, which placed him in a position to oversee much of the “reintegration” of Wagner into the College of Medicine. On March 1, 1995, while still on leave, Wagner wrote Perry a memorandum accepting TAMU’s offer. Perry responded by a memorandum dated March 3, 1995, stating that no proposals were on the table.
 

 On April 21, 1995, West, the current Head of the Department, informed Wagner by memorandum that he would be teaching Microscopic Anatomy (also called Microanatomy) in the Spring 1996 semester rather than Neuroanatomy. Wagner had no prior experience teaching Microanatomy. According to West’s memorandum, Wagner’s two-year absence from Neuroanatomy had necessitated fully staffing the course, leaving no vacancy.
 

 In June 1995, Wagner’s counsel, Gaines West (“Gaines”), notified TAMU by letter that Wagner was suffering
 
 from
 
 a chronic, serious health condition that required his taking leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601
 
 et seq.
 
 (“FMLA”). By this letter, Wagner also alleged that his illness constituted a disability under the ADA and that he was entitled to a reasonable accommodation, specifically a part-time and modified work schedule. Wagner reported for full-time duty on September 4, 1995. Wagner allegedly worked intermittently from June to September but was charged for full-time sick leave. Wagner requested an adjustment to his leave records. On December 15, 1995, Smith notified Wagner by memorandum that on June 26, 1995, he was placed on full-time sick leave. Smith stated that Wagner never requested that his leave be changed to intermittent; therefore, Smith declined to adjust Wagner’s sick leave record. On September 19, 1995, Wagner accepted the teaching reassignment from Neuroanatomy to Mieroanatomy.
 

 Wagner initiated this action on November 30, 1995. On June 27, 1996, Wagner filed a second amended complaint alleging employment discrimination under the ADA, violations of his civil rights by deprivation of tenured teaching positions and free speech interests without due process of law in violation of 42 U.S.C. § 1983, retaliation in violation of the Texas Whistleblower Act, negligent and intentional infliction of emotional distress, defamation, and fraudulent concealment of information that would have allowed Wagner to file suit earlier.
 

 In December 1995, Smith, in a memorandum to Wagner, informed him that the Neuroanatomy Course Coordinator had expressed concern for the safety of the Neuroanatomy faculty and the enrolled students should Wagner be permitted to interact with them. In addition, Smith stated that other faculty members had received threatening statements from Wagner regarding the use of firearms. Smith directed Wagner not to attend the lectures or laboratories for the Neuroanatomy course. Although the memorandum to Wagner was stamped “confidential,” copies were sent to three other faculty members as well as the special assistant to the Executive Vice President, Provost, and General Counsel of TAMU — Dr. John Gelderd (“Gelderd”), Perry, West, and Ms. Ruth Prescott (“Prescott”).
 

 Wagner remains on faculty as a tenured professor at TAMU, currently earning $117,-000 annually in salary and benefits.
 

 II.
 
 Analysis
 

 A.
 
 Summary Judgment Standard
 

 Rule 56(c) provides that “[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which he believes demonstrate the absence of a genuine issue of material fact.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91
 
 *1308
 
 L.Ed.2d 265 (1986);
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);
 
 Williams v. Adams,
 
 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.
 
 Celotex Corp.,
 
 477 U.S. at 322-23, 106 S.Ct. at 2552-53;
 
 Anderson,
 
 477 U.S. at 257, 106 S.Ct. at 2514-15;
 
 Wallace v. Texas Tech Univ.,
 
 80 F.3d 1042, 1047 (5th Cir.1996);
 
 Little v. Liquid Air Corp.,
 
 37 F.3d 1069, 1075 (5th Cir.1994)
 
 (en banc).
 
 The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.
 
 Palmer v. BRG of Ga., Inc.,
 
 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990);
 
 Anderson,
 
 477 U.S. at 255, 106 S.Ct. at 2513-14;
 
 Judwin Properties, Inc. v. United States Fire Ins. Co.,
 
 973 F.2d 432, 435 (5th Cir.1992). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial.
 
 Celotex Corp.,
 
 477 U.S. at 322, 106 S.Ct. at 2552. “In such a situation, there can be ‘no genuine issue as to any material fact,’ since a complete failure of proof concerning an essential element of the nonmoving party’s case necessarily renders all other facts immaterial.”
 
 Id.
 
 at 323, 106 S.Ct. at 2552.
 

 B.
 
 Americans with Disabilities Act
 

 Wagner maintains that he has been discriminated against in violation of Title II of the ADA. Specifically, Wagner claims that: (1) he has not been reassigned to teach the class he has traditionally taught; (2) jobs and benefits have been denied to his acquaintances; and (3) he has been exposed to unfair public ridicule intended to prey on his disability. Wagner alleges that his disability is depression and post-traumatic stress syndrome.
 

 The Defendants argue in their motion for summary judgment that Wagner may not allege claims of employment discrimination under the ADA because he failed to file a timely charge of discrimination with the Equal Employment Opportunity Commission (“EEOC”). The Defendants correctly point out that employees making claims under Title I of the ADA are required to follow the procedures for Title VII actions, which require the timely filing of an EEOC charge.
 
 See
 
 42 U.S.C. § 12117(a);
 
 Stafford v. Radford Community Hosp., Inc.,
 
 908 F.Supp. 1369, 1374 (W.D.Va.1995);
 
 Patridge v. Runyon,
 
 899 F.Supp. 291, 293 (N.D.Tex. 1995);
 
 Oswald v. Laroche Chem., Inc.,
 
 894 F.Supp. 988, 992 n. 4 (E.D.La.1995);
 
 Bent v. Mount Sinai Medical Ctr.,
 
 882 F.Supp. 353, 355 (S.D.N.Y.1995);
 
 Lewis v. Board of Trustees of Ala. State Univ.,
 
 874 F.Supp. 1299, 1302 (M.D.Ala.1995). In his second amended complaint, however, Wagner asserts a claim under Title II of the ADA, which has no filing requirement.
 
 See
 
 42 U.S.C. § 12131
 
 et seq.; Noland v. Wheatley,
 
 835 F.Supp. 476, 483 (N.D.Ind.1993).
 

 Title II, sometimes referred to as the “Public Services” title of the ADA, provides:
 

 Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 

 42 U.S.C. § 12132. “Public entity” includes any state or local government and any department, agency or other instrumentality of a state or local government. 42 U.S.C. § 12131(1)(A) and (B). Unlike Title I, which adopts the procedures set forth in Title VII requiring the exhaustion of administrative remedies, Title II adopts the “the remedies, procedures, and rights” as set forth in the Rehabilitation Act of 1973, 29 U.S.C. § 794a.
 
 See
 
 42 U.S.C. § 12133. “The Rehabilitation Act, from which Title II of the ADA draws it procedures and remedies, does not require the exhaustion of administrative remedies.”
 
 Doe v. County of Milwaukee,
 
 871 F.Supp. 1072, 1076 (E.D.Wis.1995) (citing
 
 Cook v. Rhode Island Dep’t of Mental Health, Retardation & Hosps.,
 
 783 F.Supp. 1569, 1571-72 (D.R.I.1992),
 
 affd,
 
 10 F.3d 17 (1st Cir.1993));
 
 Petersen v. University of Wis. Bd. of Regents,
 
 818 F.Supp. 1276, 1280 (W.D.Wis.
 
 *1309
 
 1993) . “A primary purpose of Title II was to extend the reach of the Rehabilitation Act to all public entities, regardless of whether or not they receive federal funds.”
 
 Ethridge v. Alabama,
 
 860 F.Supp. 808, 812 n. 6 (M.D.Ala. 1994) (citing H.Rep. No. 485(II), 101st Cong., 2d Sess. 84 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 366).
 

 Although it is not apparent from the plain language of § 12132, the regulations issued by the Department of Justice make it clear that the prohibition against discrimination by public entities includes employment discrimination.
 
 Ethridge,
 
 860 F.Supp. at 812. “No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.” 28 C.F.R. § 35.140(a). The regulations promulgated under Title II cross-reference Title I of the Act in outlining the standards by which to judge employment discrimination under Title II of the Act:
 

 (b)(1) For purposes of this part, the requirements of Title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630, apply to employment in any service, program, or activity conducted by a public entity if that entity is also subjected to the jurisdiction of Title I.
 

 Petersen,
 
 818 F.Supp. at 1278 (citing 28 C.F.R. § 35.140). Subsection (b)(2) of the same regulation provides that if the public entity is not also subject to the jurisdiction of Title I, the requirements of section 504 of the Rehabilitation Act of 1973 will apply.
 
 Id.
 
 Therefore, “[discrimination as proscribed by Title II includes employment discrimination.”
 
 Ethridge,
 
 860 F.Supp. at 812. Like Title I, Title II draws its enforcement method from other statutes. Part 1630 of the EEOC regulations interpreting Title I of the Act, covers the purpose of the Act, definitions, prohibitions, defenses, and specific activities permitted.
 
 Petersen,
 
 818 F.Supp. at 1280 (citing 29 C.F.R. §§ 1630.1-1630.16). Part 1630 does not contain any reference to exhaustion of administrative remedies or any other procedural requirements to be imposed on plaintiffs.
 
 Id.
 
 “Instead the regulations that address processing administrative complaints under Title I of the Act are contained in a separate section of the Equal Employment Opportunity Commission regulations.”
 
 Id.
 
 (citing 29 C.F.R. Part 1641). There is no reason to assume the inclusion of Title I’s procedural requirements in Title II where the regulatory reference to the EEOC requirements specifically omitted the procedural requirements found in 29 C.F.R. Pt. 1641.
 
 Silk v. City of Chicago,
 
 No. 95-C-0143, 1996 WL 312074, at *13 (N.D.Ill. June 7, 1996);
 
 Petersen,
 
 818 F.Supp. at 1280.
 

 Furthermore, Subpart F of the regulations governing Title II of the Act, which sets forth compliance procedures for administrative enforcement of the Act, explains in detail the jurisdiction over claims under the Act of both the EEOC and the Department of Justice.
 
 See
 
 28 C.F.R. §§ 35.170-178. “[T]he Department of Justice’s analysis of Subpart F states clearly that available administrative channels under Title II of the Act are optional and that plaintiffs may proceed directly to federal court if they choose to do so.”
 
 Petersen,
 
 818 F.Supp. at 1279. In addition, in the Appendix to Subpart F, in an analysis of 28 C.F.R. § 35.172 governing resolution of complaints, the regulations restate the rule of no exhaustion.
 

 The Act requires the Department of Justice to establish administrative procedures for resolution of complaints, but does not require complainants to exhaust these administrative remedies. The Committee Report makes clear that Congress intended to provide a private right of action with the full panoply of remedies for individual victims of discrimination. Because the Act does not require exhaustion of administrative remedies, the complainant may elect to proceed with a private suit at any time.
 

 Id.
 
 at 1279-80 (quoting 28 C.F.R. § 35.172, App. A). Based on the language of Title II, the regulations promulgated by the Department of Justice, and the scant case law, there appears to be no requirement that plaintiffs file an administrative complaint or otherwise follow the procedural requirements of Title I when filing a Title II claim.
 
 Dertz v. City of Chicago,
 
 912 F.Supp. 319, 324 (N.D.Ill.1995);
 
 Finley v. Giacobbe,
 
 827 F.Supp. 215, 219 (S.D.N.Y.1993).
 

 
 *1310
 
 In their reply brief, the Defendants make several intricate policy and statutory interpretation arguments urging that Wagner ought not be able to evade Title I’s procedures with Title II’s looser terms. The Defendants point out that Congress’s words in adopting Title VII enforcement procedures for ADA Title I claims may encompass possible employment actions under Title II:
 

 The powers, remedies and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies and procedures this subchapter provides to the Commission, to the Attorney General or to any person alleging discrimination on the basis of disability in violation of any provision of this
 
 chapter,
 
 or regulations promulgated under Section 12116 of this title, concerning employment.
 

 42 U.S.C. § 12117(a) (emphasis added). Wagner’s claim concerns employment and falls in the same chapter as ADA Title I. Contrary to the Defendants’ assertion, the language of § 12117(a) is not expressive of clear Congressional intent. The cited passage refers to violations of the chapter but then specifically refers only to regulations promulgated under § 12116.
 
 Silk,
 
 1996 WL 312074, at *13. Congress apparently chose not to refer to regulations promulgated under Title II’s sections, although they also encompass employment claims. Thus, there can be no finding of a clear intent to impose Title VII procedures on all possible employment claims.
 
 Id.
 

 The Defendants also point out the apparent inconsistency in permitting public sector employees to sue their employers without regard to whether they exhaust administrative procedures while private sector employees are required to comply with exhaustion requirements. “However logical such an argument may be, the statute itself is at least ambiguous on this point. In the face of this ambiguity, it is necessary to look to the regulations promulgated by the Department of Justice, whose interpretation of Title II of the Act is entitled to controlling weight.”
 
 Petersen,
 
 818 F.Supp. at 1279. As described above, the regulations indicate that public employees are entitled to proceed directly to court.
 

 Finally, the Defendants cite
 
 Lakoski v. James
 
 for the proposition that the Fifth Circuit is wary of creating such policy anomalies.
 
 See
 
 66 F.3d 751, 754 (5th Cir. 1995), petition for cert. filed, 64 U.S.L.W. 3625 (U.S. Mar. 8, 1996) (No. 95-1439).
 
 Lakoski,
 
 however, is inapposite. In
 
 Lakoski
 
 the court determined that an public employee could not use Title IX to avoid Title VII’s enforcement procedures for sex discrimination claims.
 
 Id.
 
 Two factors supported that determination: (1) Congress had intended Title IX to establish a separate (bureaucratic) mechanism to enforce a previously-established right, not to establish a new and separate right and (2) the regulations promulgated under Title IX indicated that it was not intended to provide an alternative to Title VII.
 
 Id.
 
 at 756-57 and n. 4. Here, the situation is the opposite. ADA Title I and ADA Title II created separate and distinctly enforceable rights. Title I addresses primarily the rights of disabled individuals in workplaces, while Title II addresses the rights of disabled citizens
 
 vis-a-vis
 
 the government. Further, the regulations promulgated under ADA Title II support a separate and parallel claim, as opposed to the situation in
 
 Lakoski
 
 where the regulations forced a narrower reading of the statute.
 

 While the court agrees that imposing different standards on public and private sector employees is undesirable from a policy standpoint, given the Department of Justice’s regulatory posture, this court will not fill the gaps in the ADA in an attempt to effectuate a purported Congressional intent that is not entirely evident. Thus, Wagner’s claim under the ADA is not barred due to his failure to file a timely complaint with the EEOC.
 

 Title II does not contain a statute of limitations. “When a federal civil rights law does not contain a statute of limitations, courts should borrow the statutes of limitations from state statutes governing personal injury suits, and must also refer to state rules for tolling statutes of limitations.”
 
 Doe,
 
 871 F.Supp. at 1077 (citing
 
 Cheeney v. Highland Community College,
 
 15 F.3d 79, 81-82 (7th Cir.1994)). The Fifth Circuit has
 
 *1311
 
 deemed civil rights actions brought under 42 U.S.C. §§ 1981, 1983, 1985, and 1988 analogous to Texas tort actions, and therefore, the applicable limitations period is the two years fixed by Tex.Civ.Peac.
 
 &
 
 Rem.Code Ann. § 16.003.
 
 Helton v. Clements,
 
 832 F.2d 332, 334 (5th Cir.1987). In addition, the Seventh Circuit has held that the most appropriate statute of limitations to borrow for § 504 of the Rehabilitation Act of 1973 is the one “governing personal injury suits.”
 
 Cheeney,
 
 15 F.3d at 81-82. This is significant because of the relationship between the Rehabilitation Act and Title II.
 
 Doe,
 
 871 F.Supp. at 1078. Hence, as applied to this case, any alleged acts of discrimination under Title II of the ADA occurring after November 30, 1993, will be considered at trial; any prior acts are time-barred.
 

 C.
 
 U.S.C. § 1983
 

 Wagner asserts claims under 42 U.S.C. § 1983 against Defendants West and Smith. Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law.
 
 Middlesex County Sewerage Auth. v. National Sea Clammers Ass’n,
 
 453 U.S. 1, 19, 101 S.Ct. 2615, 2625-26, 69 L.Ed.2d 435 (1981);
 
 Maine v. Thiboutot,
 
 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under color of state law caused a deprivation of a right secured by the constitution or laws of the United States. 42 U.S.C. § 1983;
 
 Daniels v. Williams,
 
 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986);
 
 Augustine v. Doe,
 
 740 F.2d 322, 324 (5th Cir.1984). A § 1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conelusory allegations.
 
 Schultea v. Wood,
 
 47 F.3d 1427, 1433 (5th Cir.1995);
 
 Fee v. Herndon,
 
 900 F.2d 804, 807 (5th Cir.),
 
 cert. denied,
 
 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990);
 
 Angel v. City of Fairfield,
 
 793 F.2d 737, 739 (5th Cir.1986);
 
 Elliott v. Perez,
 
 751 F.2d 1472, 1482 (5th Cir.1985). Thus, for Wagner to prevail, he must show that Smith or West deprived him of a right guaranteed by the constitution or laws of the United States.
 
 Baker v. McCollan,
 
 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979);
 
 Thomas v. Sams,
 
 734 F.2d 185, 191 (5th Cir.1984),
 
 cert. denied,
 
 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). Wagner must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference — not the result of mere negligence.
 
 Farmer v. Brennan,
 
 511 U.S. 825, -, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994);
 
 Davidson v. Cannon,
 
 474 U.S. 344, 348, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986);
 
 Daniels,
 
 474 U.S. at 328, 106 S.Ct. at 663;
 
 Estelle v. Gamble,
 
 429 U.S. 97, 105, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976). The points of contention with regard to Wagner’s § 1983 claims relate to whether he suffered a rights deprivation cognizable under the law and whether the defendants are entitled to qualified immunity for their actions giving rise to the claims.
 

 1.
 
 Property Interest in Benefits of Teaching Position
 

 Wagner claims that he was deprived without due process of law of the benefits of his teaching position, including the particular class he taught and seats on various boards and committees. The Defendants contend, however, that these items do not constitute a property interest, and because Wagner has no cognizable property interest, there can be no deprivation actionable under 42 U.S.C. § 1983.
 

 While the constitution protects property interests, the definition of property interests is for “existing rules or understandings that stem from an independent source such as state law.”
 
 Board of Regents of State Colleges v. Roth,
 
 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The employment-related property interest in dispute in most § 1983 cases is a property interest in a job itself or the compensation associated with that job. Wagner makes no claims relating to economic benefits — he does not claim to have been discharged and or deprived of his compensation. Indeed, not only was Wagner assigned to teach again, he suffered no decreases in salary despite having a lighter course load and reduced administrative responsibilities. Therefore, the laws of Texas and Wagner’s established contractual
 
 *1312
 
 rights must be examined to determine whether he had any property interest in his Neuroanatomy teaching assignment, seats he had or may have been granted on various boards and committees, or his position as Department Head.
 

 Wagner cites two cases in support of his position that he had a valid property interest in the responsibilities and noneconomic benefits of his position.
 
 See Thomas v. Board of Trustees of Galveston Ind. Sch. Dist,
 
 515 F.Supp. 280, 285 (S.D.Tex.1981);
 
 Courtney v. University of Tex. Sys.,
 
 806 S.W.2d 277, 286 (Tex.App. — Fort Worth 1991, writ denied). Neither, however, supports his contention. In
 
 Courtney,
 
 the court held that a non-tenured professor working under a contract guaranteeing reassignment given satisfactory teaching has a tenure-like property interest in his continued employment. 806 S.W.2d at 286. This is a traditional economic benefit, not the kind of noneconomic perquisite of which Wagner claims to have been deprived. Similarly, in
 
 Thomas,
 
 the court’s holding is limited to rights and benefits created under a contract of employment. 515 F.Supp. at 285. Here, Wagner has made no claims of breach of an employment contract. He has presented no written agreements between himself and TAMU and has not attempted to prove any verbal understandings or oral agreements indicating that he would retain the noneconomic benefits of his position. Hence, Wagner must rely on the argument that he cannot be deprived of any once-held benefits or responsibilities without due process of law, even when those benefits are noneconomic in nature.
 

 The Fifth Circuit has held that employees suffer no compensable damage from employment terminations when they receive their full compensation.
 
 Kinsey v. Salado Indep. Sch. Dist.,
 
 950 F.2d 988, 997 (5th Cir.),
 
 cert. denied,
 
 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 201 (1992);
 
 Davis v. Mann,
 
 882 F.2d 967, 973 (5th Cir.1989) (citing
 
 Robinson v. Boyer,
 
 825 F.2d 64, 67 (5th Cir.1987);
 
 Jett v. Dallas Indep. Sch. Dist.,
 
 798 F.2d 748, 753-54 (5th Cir.1988),
 
 affd in part, vacated in part, and remanded on other grounds,
 
 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Even where a contract specifies what an employee’s duties and responsibilities are, duties outlined in the contract do not constitute protectible, noneconomic property interests under the contract.
 
 Davis,
 
 882 F.2d at 967. If contractual understandings guarantee that an employee will not be demoted or reassigned to a position of less responsibility, a property interest may arise.
 
 Winkler v. County of DeKalb,
 
 648 F.2d 411, 414 (5th Cir.1981). Such a contractual understanding must be mutual and explicit.
 
 Jett,
 
 798 F.2d at 754 (citing
 
 Perry v. Sindermann,
 
 408 U.S. 593, 601, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972)). In this case, there is no claim that a contract or even a custom hampered the discretion of TAMU officials to assign professors as needed. Absent a contractual provision limiting the University’s right to reassign Wagner, he has no property interest in his teaching assignment, or in teaching classes at all.
 
 Dooley v. Fort Worth Indep. Sch. Dist.,
 
 686 F.Supp. 1194, 1199 (N.D.Tex.1987),
 
 affd,
 
 866 F.2d 1418 (5th Cir.),
 
 cert. denied,
 
 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989);
 
 Harris v. Mississippi Valley State Univ.,
 
 899 F.Supp. 1561, 1574 n. 15 (N.D.Miss.1995). An assignment of other duties cannot amount to a deprivation of a property interest unless it is so unreasonable that it amounts to a constructive discharge.
 
 Quives v. Campbell,
 
 934 F.2d 668, 671 (5th Cir.1991);
 
 Kelleher v. Flawn,
 
 761 F.2d 1079, 1087 (5th Cir.1985). Here, there is no claim of constructive discharge, as Wagner remains employed by TAMU.
 

 Wagner’s appointments to boards and committees, likewise, cannot support a property interest claim. There is no evidence that these appointments afforded Wagner any compensation that would rise to the level of a protectible interest. Work responsibilities that are uncompensated do not create protectible property interests under § 1983.
 
 Raju v. Rhodes,
 
 809 F.Supp. 1229, 1239 (S.D.Miss.1992),
 
 affd,
 
 7 F.3d 1210 (5th Cir.1993),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1543, 128 L.Ed.2d 194 (1994).
 

 Because Wagner has no property interest in his teaching assignment or in his various administrative duties and responsibilities, summary judgment on Wagner’s due process
 
 *1313
 
 claims under § 1983 related to his position is proper.
 

 2.
 
 Free Speech Interest
 

 Wagner claims that he was retaliated against because he exercised his rights to speak freely on matters of public concern, depriving him of his liberty without due process of law. In the Defendants’ motion for summary judgment, Smith and West argue that Wagner has not suffered an adverse employment action that would support his claim of an endangered liberty interest. Their argument assumes that Wagner’s restricted liberty involves his freedom to work or freedom from adverse employment determinations. The Defendants, however, misapply the law on Wagner’s
 
 free
 
 speech claim. The only deprivation Wagner needs to show is that of his right to speak freely,
 
 ie.,
 
 that he has been retaliated against because he chose to speak.
 

 The Defendants correctly point out that in order to make a claim under the First Amendment, Wagner must show that he engaged in protected speech and that such activity was a substantial and motivating factor in adverse action against him.
 
 Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,
 
 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The Defendants do not dispute Wagner’s claims that he engaged in protected speech or that such speech could have motivated any actions determined to be adverse. Instead, the Defendants contend that Wagner has not suffered any adverse employment actions. The Defendants cite
 
 Pierce v. Texas Dep’t of Criminal Justice, Inst. Div.
 
 for the proposition that only a limited number of actions are adverse under the law:
 

 To establish a First Amendment violation, a public employee must demonstrate that she has suffered an adverse employment action for exercising her right to free speech.
 
 McCabe v. Sharrett, 12 F.3d
 
 1558, 1563 (11th Cir.1994). Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.
 
 Id.
 

 37 F.3d 1146, 1149 (5th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995). The quotation above could, as Defendants suggest, be read as limiting what can constitute an adverse employment action. The authority cited therein,
 
 McCabe,
 
 does not appear to limit the scope of adverse actions to the same list, and the precedent
 
 McCabe
 
 cites,
 
 Goffer v. Marbury,
 
 offers these actions only as examples of adverse employment actions.
 
 See McCabe,
 
 12 F.3d at 1562-63;
 
 Goffer v. Marbury,
 
 956 F.2d 1045, 1049 n. 1 (11th Cir.1992). In fact, the court in
 
 Pierce
 
 went further to assess whether the retaliation suffered by the plaintiff resulted in an adverse employment action and did not merely rely on its “short list” of adverse actions; it evaluated the employment actions for adverse results.
 
 See
 
 37 F.3d at 1150. In light of the precedent relied on by the Fifth Circuit in
 
 Pierce,
 
 this court will not resolve seemingly conflicting approaches to limit the scope of adverse actions at the summary judgment stage.
 

 Other Fifth Circuit precedent indicates a more expansive reading of what may be considered an adverse employment action. Any important condition of employment may qualify for protection under § 1983:
 

 Where, as here, important conditions of employment are involved, a public employee will not be foreclosed from § 1983 relief merely because the impermissible retaliation did not result in the termination of his employment.
 

 Bickel v. Burkhart,
 
 632 F.2d 1251, 1255 (5th Cir.1980). In
 
 Bickel,
 
 a fireman was not promoted as he expected due to retaliation for negative comments he had made at a department meeting.
 
 Id.
 
 at 1253. The plaintiff was not discharged and he suffered no decrease in pay.
 
 Id.
 
 In a subsequent case, deputies transferred from law enforcement positions to jail guard duty in retaliation for their candidacies for sheriff were found to state a claim under § 1983:
 

 Money alone, however, does not buy happiness. The
 
 Perry
 
 Court spoke of “benefits” generally, not just salary. The evidence adduced at trial strongly supports the proposition that jobs in the jail are not as interesting or prestigious as jobs in the law enforcement section____ In short, Click and Falcon’s transfers to the jail could be
 
 *1314
 
 considered demotions, even though they suffered no reduction in salary.
 

 Click v. Copeland,
 
 970 F.2d 106, 110 (5th Cir.1992) (citing
 
 Perry,
 
 408 U.S. at 597, 92 S.Ct. at 2697-98). In a more recent case, the Fifth Circuit confirmed the- applicability of retaliatory transfer analysis to First Amendment claims: “[T]he law was clearly established [in
 
 Copeland
 
 ] that a retaliatory transfer to a less interesting, less prestigious position could implicate the First Amendment, even if the transfer did not result in a decrease in pay.”
 
 Vojvodich v. Lopez,
 
 48 F.3d 879, 887 (5th Cir.),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 169, 133 L.Ed.2d 111 (1995). The Defendants’ reliance on
 
 Dorsett v. Board of Trustees for State Colleges & Univs.
 
 to narrow the scope of adverse employment actions is misplaced.
 
 See
 
 940 F.2d 121, 124 (5th Cir.1991). The court in
 
 Dorsett
 
 failed to foreclose the chance that teaching reassignments and intrafaculty disputes create a cognizable constitutional claim under a liberty interest analysis, as the court determined that there was no protected speech involved in the case.
 
 Id.
 
 Hence, any comments about faculty disputes were merely
 
 dicta.
 

 The Defendants next argue that Wagner must satisfy the traditional “stigma plus” test in order to show a violation of a liberty interest.
 
 See Vander Zee v. Reno,
 
 73 F.3d 1365, 1369 (5th Cir.1996). The Defendants, however, misconstrue the law. Wagner would have to show “stigma plus” if he were alleging that some defamation infringed his liberty,
 
 i.e.,
 
 in the sense of restricting his right to pursue his career or find new employment, or that the Defendants infringed on a liberty created under state law, as in the § 1983 property interest claim. Wagner alleges instead that he was retaliated against because of past free expression and that such retaliation has a chilling effect on his subsequent free expression.
 

 The
 
 Schultea
 
 case, cited by the Defendants, demonstrates that a plaintiff may simultaneously pursue separate § 1983 claims — one based on the liberty to pursue employment and another based on retaliation for First Amendment protected speech.
 
 See
 
 47 F.3d at 1429, 1434. In
 
 Schultea,
 
 a former police chief who had been reassigned to assistant chief maintained that he had been deprived of his liberty interest to be employed in his position and to clear his name.
 
 Id.
 
 at 1429. He additionally alleged a retaliatory violation of his First Amendment rights.
 
 Id.
 
 Although he had no protectible property interest in his employment, he was allowed to maintain an action for First Amendment violations under § 1983.
 
 Id.
 
 at 1429,1434.
 

 The Supreme Court also recognizes the dichotomy between due process rights that protect interests established outside the constitution and interests established by the constitution.
 
 Paul v. Davis,
 
 424 U.S. 693, 710, 96 S.Ct. 1155, 1164-65, 47 L.Ed.2d 405 (1976). A “variety of interests” within the terms “liberty” and “property” are afforded due process protection “by virtue of the fact that they have been initially recognized and protected by state law.”
 
 Id.
 
 Even where a defendant does not deprive a claimant of “liberty” or “property” interests “recognized by state or federal law,” a claimant may still allege and show violations of rights guaranteed by the constitution.
 
 Id.
 
 at 712, 96 S.Ct. at 1165-66. A reassignment within the workplace to positions that are less productive and less satisfying, though it does not implicate property interests, may still serve as the basis for a First Amendment claim.
 
 See Fyfe v. Curlee,
 
 902 F.2d 401, 404 (5th Cir.),
 
 cert. denied,
 
 498 U.S. 940, 111 S.Ct. 346, 112 L.Ed.2d 310 (1990). Indeed, a non-tenured teacher, who concededly has no property interest in his position or assignment, may, nonetheless, assert a valid First Amendment claim.
 
 White v. South Park Indep. Sch. Dist.,
 
 693 F.2d 1163, 1167 n. 5 (5th Cir.1982) (citing
 
 Mount Healthy City Sch. Dist. Bd. of Educ.,
 
 429 U.S. at 283, 97 S.Ct. at 574). Retaliation by way of demotion, transfer, or reassignment undermines the ability of public employees to speak or testify truthfully without fear of reprisal and thus impinges on their right to free speech under the First Amendment.
 
 Johnston v. Harris County Flood Control Dist.,
 
 869 F.2d 1565, 1578 (5th Cir.1989),
 
 cert. denied,
 
 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990);
 
 Reeves v. Claiborne
 
 
 *1315
 

 County Bd. of Educ.,
 
 828 F.2d 1096, 1100 (5th Cir.1987).
 

 Wagner has asserted a viable claim under § 1983. His preference for the Neuroanatomy assignment, while not rising to the level of a property interest, may provide the basis of a First Amendment claim. The affidavits of Wagner and Ian Russell (“Russell”), a professor at TAMU, suggest that a reassignment to Microanatomy could embarrass or burden a professor who had taught in a different area for years and was approaching retirement. Under these circumstances, such a reassignment can serve as an adverse employment action; no “stigma” test need be met. Therefore, Wagner may proceed to trial on this claim.
 

 3.
 
 Property Interest in the “Reintegration Agreement”
 

 Wagner claims that he is a third-party beneficiary of an agreement between TAMU and the ORI to “reintegrate” and protect Wagner and that West and Smith have deprived him of property interests in this agreement. Wagner has failed to show the existence of such an agreement, that such an agreement was breached, or that he would be the intended beneficiary of such an agreement. Therefore, the “reintegration agreement” provides no basis for a claim under § 1983.
 

 A third party has a heavy burden to prove third-party beneficiary status.
 
 Missouri Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.,
 
 26 F.3d 531, 540 (5th Cir.1994);
 
 RTC v. Kemp,
 
 951 F.2d 657, 662 (5th Cir. 1992). “A third party is entitled to recover upon a contract made between other parties only if the parties intended to' secure some benefits to that third party, and only if the contract was entered into directly and primarily for the third party’s benefit.”
 
 Economy Forms Corp. v. Williams Bros. Constr. Co.,
 
 754 S.W.2d 451, 456 (Tex.App.—Houston [14th Dist.] 1988, no writ) (citing
 
 Dairyland County Mut. Ins. Co. v. Childress,
 
 650 S.W.2d 770, 775 (Tex.1983));
 
 Republic Nat’l Bank v. National Bankers Life Ins. Co.,
 
 427 S.W.2d 76, 79 (Tex.Civ.App. — Dallas 1968, writ refd n.r.e.). Specifically,' in order to establish third-party beneficiary status, a noncontracting party must show: (1) that he is not privy to a contract; (2) that the contract was made for the claimant’s benefit; and (3) that the contracting parties intended for the claimant to benefit by their contract.
 
 Palma v. Verex Assurance, Inc.,
 
 79 F.3d 1453, 1457 (5th Cir.1996);
 
 Missouri Pac. R. Co.,
 
 26 F.3d at 540;
 
 Talman Home Fed. Sav. & Loan Ass’n v. American Bankers Ins.,
 
 924 F.2d 1347, 1350-51 (5th Cir.1991);
 
 Hellenic Inn, Inc. v. Kroger Co.,
 
 766 S.W.2d 861, 864 (TexApp.—Houston [1st Dist.] 1989, no writ). Hence, in the absence of a contract, one cannot assert rights as a third-party beneficiary.
 

 There are three types of third party beneficiaries — donee, creditor, and incidental.
 
 Bruner n Exxon Co., U.S.A,
 
 752 S.W.2d 679, 682 (TexApp.—Dallas 1988, writ denied);
 
 Merit Drilling Co. v. Honish,
 
 715 S.W.2d 87, 92 (TexApp.—Corpus Christi 1986, writ refd n.r.e.). A party is a donee beneficiary “ ‘[i]f the performance promised ... will, when rendered, come to the person as a pure donation.’ ”
 
 Brunswick Corp. v. Bush,
 
 829 S.W.2d 352, 354 (Tex.App.—Fort Worth 1992, no writ) (quoting
 
 Breaux v. Banker,
 
 107 S.W.2d 382, 389 (Tex.Civ.App.—Beaumont 1937),
 
 rev’d on other grounds,
 
 133 Tex. 183, 128 S.W.2d 23 (1939));
 
 see also Suthers n Booker Hosp. Dist.,
 
 543 S.W.2d 723, 727 (Tex.Civ.App. — Amarillo 1976, writ refd n.r.e.). A party is a creditor beneficiary “ ‘[i]f ... that performance will come to him in satisfaction of a legal duty owed to him by the promisee.’ ”
 
 Brunswick Corp.,
 
 829 S.W.2d at 354 (quoting
 
 Breaux,
 
 107 S.W.2d at 389); see
 
 also Suthers,
 
 543 S.W.2d at 727. Although donee and creditor beneficiaries may enforce a contract to which they are not a party, an incidental beneficiary — one who is benefitted only incidentally by the performance of the contract — has no such right of enforcement.
 
 Tennessee Gas Pipeline Co. v. Lenape Resources Corp.,
 
 870 S.W.2d 286, 295 (TexApp.—San Antonio 1993),
 
 affd in part and rev’d in part on other grounds,
 
 925 S.W.2d 565 (Tex.1996);
 
 Bruner,
 
 752 S.W.2d at 682;
 
 Republic Nat’l Bank,
 
 427 S.W.2d at 80.
 

 
 *1316
 
 Moreover, there is a presumption that the parties to a contract entered into the contract for themselves, and, therefore, the contract will not be construed to benefit a third party unless it clearly appears that this was the intention of the contracting parties.
 
 Oliver Resources PLC v. International Fin. Corp.,
 
 62 F.3d 128, 131 (5th Cir.1995);
 
 Missouri Pac. R.R. Co.,
 
 26 F.3d at 540;
 
 Kemp,
 
 951 F.2d at 662;
 
 Talman Home Fed. Sav. & Loan Ass’n,
 
 924 F.2d at 1351;
 
 Thomson v. Espey Huston & Assocs., Inc.,
 
 899 S.W.2d 415, 418 (Tex.App.—Austin 1995, no writ). The intent of the parties to the contract is of “controlling significance to a determination that a third party may enforce” a contract.
 
 Oliver Resources PLC,
 
 62 F.3d at 131;
 
 see also Old Stone Bank v. Fidelity Bank,
 
 749 F.Supp. 147, 152 (N.D.Tex.1990). Any intent of the contracting parties to benefit a third party must be derived solely from the language of the contract.
 
 Talman Home Fed. Sav. & Loan Ass’n,
 
 924 F.2d at 1351;
 
 Republic Nat’l Bank,
 
 427 S.W.2d at 79. “It is the intention and purpose of the contracting parties, as disclosed within the four corners of the instrument, which should control.”
 
 Talman Home Fed. Sav. & Loan,
 
 924 F.2d at 1351 (citing
 
 Republic Nat’l Bank,
 
 427 S.W.2d at 79). If there is any doubt concerning the intent to benefit a third party, such doubt must be construed against such intent.
 
 Id.; Tennessee Gas Pipeline Co.,
 
 870 S.W.2d at 295.
 

 Here, Wagner points to no instrument, no language, and no terms of an agreement by which the intent of the parties may be construed. Wagner cannot show that he is an intended beneficiary of TAMU’s compliance “agreement.” There is no evidence of intent on the part of TAMU with respect to this “agreement” to do anything but comply with federal law to avoid sanctions. TAMU’s letters addressing compliance with federal regulations cannot be viewed as a contract or an agreement between the university and the government, as they merely acknowledge TAMU’s preexisting obligations under the law. Even if an agreement were found to exist, Wagner, at best, could be considered an incidental beneficiary and, as such, without standing to enforce the terms of the agreement.
 

 Wagner further contends that TAMU voluntarily assumed a duty to protect him in discussions with ORI and that he may benefit from TAMU’s actions. His reliance on the “Good Samaritan” doctrine is unfounded. First, Wagner must still show that he is an intended beneficiary, which he has not done. Second, he must show that TAMU “voluntarily undertook” a duty.
 
 See Mafrige v. United States,
 
 893 F.Supp. 691, 702 (S.D.Tex.1995);
 
 Brownsville Navigation Dist. v. Izaguirre,
 
 829 S.W.2d 159, 161 (Tex. 1992);
 
 Northwest Bank v. Garrison,
 
 874 S.W.2d 278, 280 (Tex.App.—Houston [1st Dist.] 1994, no writ). Wagner has failed to show any voluntary assumption of duties on the part of TAMU. If anything, it appears that TAMU undertook any obligations it did solely to avoid federal censure. To the extent that an agreement could be discerned in this haze, it is apparent that it has not been breached. The communication from ORI to Dr. Bowen, President of TAMU, indicates that the only matter it considers to be incomplete is the making of a final statement on the matter, the draft of which is still in Wagner’s hands. Because one of the alleged parties to the purported agreement considers the Wagner matter to be resolved, Wagner’s claim that he has been deprived of contractual rights is tenuous at best. Without some showing of an agreement of which Wagner can be more than an incidental beneficiary, there can be no deprivation of property rights cognizable under § 1983. Therefore, summary judgment is warranted as to this claim.
 

 4.
 
 Statute of Limitations as to § 1988 Claims
 

 West and Smith allege that because the events giving rise to Wagner’s claim occurred more than two years prior to Wagner filing suit on November 30, 1995, Wagner’s claims are time-barred. Alternatively, West and Smith contend that only those events occurring on or after November 30,1993, may give rise to valid § 1983 claims.
 

 There is no specific federal statute of limitations governing claims brought under § 1983. Federal courts, therefore,
 
 *1317
 
 look to the law of the state in which the action arose to determine the appropriate limitations period, usually borrowing the state’s general personal injury limitations period.
 
 Hardin v. Straub,
 
 490 U.S. 536, 538, 109 S.Ct. 1998, 2000, 104 L.Ed.2d 582 (1989);
 
 Owens v. Okure,
 
 488 U.S. 235, 236, 109 S.Ct. 573, 574, 102 L.Ed.2d 594 (1989);
 
 Wilson v. Garcia,
 
 471 U.S. 261, 269, 105 S.Ct. 1938, 1943, 85 L.Ed.2d 254 (1985);
 
 Pedraza v. Jones,
 
 71 F.3d 194, 195 n. 1 (5th Cir.1995);
 
 Rodriguez v. Holmes,
 
 963 F.2d 799, 803 (5th Cir.1992);
 
 Burrell v. Newsome,
 
 883 F.2d 416, 418 (5th Cir.1989). It is undisputed that the events giving rise to the case at bar occurred in Texas. Because § 1983 claims are most analogous to Texas personal injury claims, the applicable statute of limitations is two years, as set forth in Tex.Civ.Prac. & Rem. Code Ann. § 16.003.
 
 See Russell v. Board of Trustees of Firemen, Policemen & Fire Alarm Operators’ Pension Fund,
 
 968 F.2d 489, 492 (5th Cir.1992),
 
 cert. denied,
 
 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993);
 
 Rodriguez,
 
 963 F.2d at 803;
 
 Jackson v. Johnson,
 
 950 F.2d 263, 265 (5th Cir.1992);
 
 Burrell, 883
 
 F.2d at 418;
 
 Helton,
 
 832 F.2d at 334. While state law determines the limitations period, federal law determines when a cause of action accrues.
 
 Board of Regents v. Tomanio,
 
 446 U.S. 478, 483-86, 100 S.Ct. 1790, 1794-96, 64 L.Ed.2d 440 (1980);
 
 Rodriguez,
 
 963 F.2d at 803;
 
 Brummett v. Gamble,
 
 946 F.2d 1178, 1184 (5th Cir.1991),
 
 cert. denied,
 
 504 U.S. 965, 112 S.Ct. 2323, 119 L.Ed.2d 241 (1992);
 
 Burrell,
 
 883 F.2d at 418;
 
 Helton,
 
 832 F.2d at 334-85.
 

 Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury that is the basis of his action.
 
 Gartrell v. Gaylor,
 
 981 F.2d 254, 257 (5th Cir.1993);
 
 Burrell,
 
 883 F.2d at 418. “The statute of limitations therefore begins to run when the plaintiff is in possession of the ‘critical facts that he has been hurt and who has inflicted the injury____’ ”
 
 Gartrell,
 
 981 F.2d at 257 (quoting
 
 Lavellee v. Listi,
 
 611 F.2d 1129, 1130 (5th Cir.1980));
 
 accord Brummett,
 
 946 F.2d at 1184;
 
 Burrell,
 
 883 F.2d at 418. “A plaintiffs awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant’s actions.”
 
 Piotrowski v. City of Houston,
 
 51 F.3d 512, 516 (5th Cir.1995);
 
 see also Moore v. McDonald,
 
 30 F.3d 616, 620-21 (5th Cir. 1994);
 
 Glover v. Johnson,
 
 831 F.2d 99, 100 (5th Cir.1987);
 
 Kline v. North Tex. State Univ.,
 
 782 F.2d 1229, 1232 (5th Cir.1986). Therefore, events occurring prior to November 30, 1993, will not form the basis of a claim in this case unless Wagner is entitled to rely on the principles of equitable tolling. “Where a state statute of limitations is borrowed, the state’s rules for tolling the statute are borrowed as well.”
 
 Hickey v. Irving Indep. Sch. Dist.,
 
 976 F.2d 980, 984 n. 8 (5th Cir.1992) (citing
 
 Tomanio,
 
 446 U.S. at 485, 100 S.Ct. at 1795-96);
 
 see also Rodriguez,
 
 963 F.2d at 803;
 
 Jackson v. Johnson,
 
 950 F.2d 263, 265 (5th Cir.1992). None of the equitable tolling doctrines claimed by Wagner, however, assists him in this ease.
 

 (a).
 
 Unsound Mind
 

 In Wagner’s second amended complaint, he alleges that his condition, depression and related health problems, reasonably delayed his discovery of the harm caused by the Defendants. In Texas, the statute of limitations is suspended for those under legal disability. Tex.Civ.Prac.
 
 &
 
 Rem. Code Ann. § 16.001(b). The disability exclusion protects those plaintiffs who lack access to the courts or are unable “to participate in, control, or even understand the progression and disposition of their lawsuit.”
 
 Ruiz v. Conoco, Inc.,
 
 868 S.W.2d 752, 755 (Tex.1993). A person claiming the benefit of suspension of limitations must raise the issue of his “unsound mind.”
 
 Hargraves v. Armco Foods, Inc.,
 
 894 S.W.2d 546, 547 (TexApp.— Austin 1995, no writ); Tex.Civ.Prac.
 
 &
 
 Rem. Code Ann. § 16.001(a). An “unsound mind” generally is considered equivalent to insanity or incompetency, though an individual need not be adjudicated insane or incompetent to warrant protection.
 
 Hargraves,
 
 894 S.W.2d at 547;
 
 Casu v. CBI Na-Con, Inc.,
 
 881 S.W.2d 32, 34 (TexApp.—Houston [14th Dist.] 1994, no writ).
 

 It is the plaintiffs burden to show that he is of unsound mind and to demonstrate when such period of disability
 
 *1318
 
 ended, if it is not ongoing.
 
 Smith v. Erhard,
 
 715 S.W.2d 707, 709 (Tex.App.—Austin 1986, writ refd n.r.e.). Wagner has not met his burden. He has not shown that he is or was legally disabled; he only makes vague references to “reasonable delay” without citing authority for recognizing such a delay. Wagner also does not allege what harm caused by the Defendants he was unable to discover or during what periods his condition prevented discovery. There is no evidence before the court that Wagner has been impaired to such an extent that he was incapable of understanding or appreciating the events in controversy at any time during the eight-year period before he filed suit. Rather, it appears that during this period, Wagner was able to write lengthy and insightful letters concerning his situation and to negotiate a retirement package with TAMU representatives. Hence, his alleged condition affords no basis for the suspension of limitations.
 

 (b).
 
 Participation in Internal Grievance Procedure
 

 Wagner next claims a tolling benefit from his participation in an internal grievance procedure. The court need not determine whether negotiations between Wagner and TAMU constitute a grievance procedure, because grievance procedures and collateral reviews of employment decisions do not toll the running of limitations periods under § 1983.
 
 See Delaware State College v. Ricks,
 
 449 U.S. 250, 261, 101 S.Ct. 498, 505-06, 66 L.Ed.2d 431 (1980). The pendency of an internal grievance procedure does not suspend limitations, particularly when the grievance procedure would not rectify the problem giving rise to the grievance.
 
 Barrow v. New Orleans S.S. Ass’n,
 
 932 F.2d 473, 478 (5th Cir.1991). If the negotiations were deemed a grievance procedure, their end goal was not the return of Wagner to the position of Department Head or an equivalent position. Rather, their goal was his retirement and/or the settlement of his claims. If the negotiation process had been successful and Wagner had retired with full benefits, he arguably could still maintain a claim for infringement of his right to free speech unless specifically released. Because the resolution of his “grievance” was not an intrinsic purpose of the negotiations, the negotiations are particularly unsuited for purposes of tolling. Thus, the statute of limitations was not tolled by the series of conferences between Wagner and TAMU.
 

 (c).
 
 Fraudulent Concealment
 

 Furthermore, as a separate cause of action, Wagner claims that discovery in this ease has revealed substantial fraudulent concealment on the part of the Defendants. Wagner seeks to invoke this affirmative defense in an effort to toll the two-year statute of limitations.
 

 “Under Texas law, fraudulent concealment is an affirmative defense to an assertion that the statute of limitations has run.”
 
 Timberlake v. AH. Robins Co.,
 
 727 F.2d 1363, 1366 (5th Cir.1984). The Texas Supreme Court explained:
 

 When the defendant is under a duty to make a disclosure but fraudulently conceals the existence of a cause of action from the one to whom it belongs, the guilty party will be estopped from relying on the defense of limitations until the right of action is, or in the exercise of reasonable diligence should be, discovered.
 

 Id.
 
 (quoting
 
 Nichols v. Smith,
 
 507 S.W.2d 518, 519 (Tex.1974)). To prove fraudulent concealment, a plaintiff must show: (1) that the defendants had actual knowledge of a wrong to the plaintiff; (2) that the defendants had a fixed purpose to conceal the wrong from the plaintiff; and (3) that the defendants had a duty to expose the wrong.
 
 Casey v. Methodist Hosp.,
 
 907 S.W.2d 898, 903 (TexApp.—Houston [1st Dist.] 1995, no writ);
 
 Waters ex rel Walton v. Del-Ky, Inc.,
 
 844 S.W.2d 250, 256 (TexApp.—Dallas 1992, no writ). “The ‘mere failure to disclose a cause of action, or its mere concealment,’ does not constitute fraudulent concealment for purposes of tolling the statute of limitations.”
 
 Timberlake,
 
 727 F.2d at 1366 (quoting
 
 Stiles v. Union Carbide Corp.,
 
 520 F.Supp. 865, 868-69 (S.D.Tex.1981)). “Rather, the plaintiff is under a duty to exercise reasonable diligence to discover his or her cause of action.”
 
 Id.
 
 Thus, the Fifth Circuit has stated, “‘There cannot be fraudulent
 
 *1319
 
 concealment of facts which admittedly were or should have been known by [the plaintiff].’ ”
 
 Id.
 
 at 1367 (quoting
 
 Fusco v. Johns-Manville Prods. Corp.,
 
 643 F.2d 1181, 1184 (5th Cir.1981)).
 

 Here, in support of his fraudulent concealment argument, Wagner asserts that: (1) there are at least five versions of the Board of Inquiry Report and the version given to him had been carefully edited to delete its recommendation that Wagner lose his position as Department Head because of the original Trulson investigation; (2) TAMU’s files on him contain untrue allegations of theft, drug use, alcohol addiction, misuse of prescriptions, a homosexual affair with another professor, scientific fraud, and other improprieties, and these allegations were distributed widely without his knowledge; (3) Trulson and TAMU made a secret agreement in 1988 that Trulson would resign instead of being fired and that his TAMU file would not reflect anything negative, such as scientific misconduct, and that TAMU had waived its right to make findings against Trulson or properly publicize his wrongdoing; (4) TAMU fraudulently concealed the secret agreement with Trulson, which prevented TAMU from vindicating Wagner officially; (5) Smith and West for years have shared the secret belief that he has a violent, threatening, and dangerous nature; (6) Smith intentionally misled him as to what TAMU general counsel’s office had decided to do about the ownership of his teaching materials in Fall 1991, secretly taking steps to fire him; and (7) Sam Black (“Black”), the acting Dean of the College of Medicine had strongly disagreed with the administration’s decision to cut the secret deal with Trulson.
 

 It is unnecessary to determine whether Wagner has established that any events were fraudulently concealed, as he has not shown that any fraudulently concealed events give rise to viable claims. The only concealed events Wagner can point to are the Trulson settlement agreement and the Board of Inquiry report recommending Wagner’s “demotion.” Neither of these would have given rise to a claim on the day of their occurrence, much less years later. Even -if they were meaningful, Wagner has been aware that Trulson was not being pursued aggressively by TAMU since at least 1988, when his frequent complaints went ignored, and he was aware of his “demotion” when it happened in 1989. Without some showing of a fraudulently concealed fact that would have led Wagner to file suit earlier had he been aware of it, the issue of the Defendants’ purpose to conceal and their duty to expose the wrong need not be considered. Thus, the doctrine of fraudulent concealment affords Wagner no relief from the statute of limitations.
 

 Finally, Wagner claims that the statute of limitations would not start running until such time as TAMU’s failure to reintegrate him was apparent. Wagner correctly asserts that the limitations period does not begin to run until the cause of action accrues.
 
 Kline,
 
 782 F.2d at 1232. Wagner would not have had a claim on the day that TAMU informed the OSI of its intent to adopt the Milford Committee Report — February 2, 1993. As of that day, he reasonably could have believed that TAMU had committed itself to cease the circulation of rumors about Wagner’s teaching and integrity, affirmatively protect his reputation, and “reintegrate” him into teaching and other responsibilities. Whether TAMU accomplished those goals is for the finder of fact. Because the Defendants do not allege that Wagner had any reason before November 30, 1993 (while he was on leave) to believe that TAMU would not fulfill the recommendations of the report, his claims concerning reintegration are not foreclosed. Hence, Wagner’s claim that he was retaliated against after November 30, 1993, for free speech on matters of public concern may proceed, without regard to whether those events relate in some way to TAMU’s ORI compliance efforts commencing prior to November 30,1993. Claims relating to his “demotion” from Department Head, the denial of an $80,000 grant, and any other event prior to November 30, 1993, however, are barred by the statute of limitations.
 

 5.
 
 Qualified Immunity
 

 Defendants West and Smith assert that they are entitled to qualified immunity in this case. Under the doctrine of qualified immunity, government officials per
 
 *1320
 
 forming discretionary functions are shielded from liability for civil damages “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.”
 
 Harlow v. Fitzgerald, 457
 
 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982);
 
 Doe v. Hillsboro Indep. Sch. Dist.,
 
 81 F.3d 1395, 1405 (5th Cir.1996). Qualified immunity is available to defendant officials in suits arising under § 1983 and must be pled as an affirmative defense.
 
 Siegert v. Gilley,
 
 500 U.S. 226, 231, 111 S.Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991);
 
 Harlow, 457
 
 U.S. at 816, 102 S.Ct. at 2737;
 
 Gomez v. Toledo,
 
 446 U.S. 635, 640, 100 S.Ct. 1920, 1923-24, 64 L.Ed.2d 572 (1980). It is an immunity from suit, extending beyond a defense to liability to include all aspects of civil litigation, including discovery.
 
 Jacquez v. Procunier,
 
 801 F.2d 789, 791 (5th Cir.1986);
 
 see also Mitchell v. Forsyth,
 
 472 U.S. 511, 526, 105 S.Ct. 2806, 2815-16, 86 L.Ed.2d 411 (1985).
 

 When determining whether qualified immunity is available, the actions of a reasonably competent official are assessed in the light of the legal rules that were clearly established at the time the action was taken.
 
 Anderson v. Creighton,
 
 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987);
 
 Harlow, 457
 
 U.S. at 818, 102 S.Ct. at 2738;
 
 Mitchell,
 
 472 U.S. at 530, 105 S.Ct. at 2817-18;
 
 Mangieri v. Clifton,
 
 29 F.3d 1012, 1016 (5th Cir.1994);
 
 Bennett v. City of Grand Prairie,
 
 883 F.2d 400, 408 (5th Cir.1989). A legal right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.
 
 Anderson,
 
 483 U.S. at 640, 107 S.Ct. at 3039;
 
 Hale v. Townley, 45
 
 F.3d 914, 919 (5th Cir. 1995);
 
 Foster v. City of Lake Jackson,
 
 28 F.3d 425, 429 (5th Cir.1994);
 
 Bennett,
 
 883 F.2d at 408.
 

 A party seeking damages from an official asserting qualified immunity bears the burden of overcoming that defense.
 
 Id.; United States v. Burzynski Cancer Research Inst.,
 
 819 F.2d 1301, 1310 (5th Cir.1987),
 
 cert. denied,
 
 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988);
 
 Saldana v. Garza,
 
 684 F.2d 1159, 1163 (5th Cir.1982),
 
 cert, denied,
 
 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). In order to defeat an official’s assertion of qualified immunity, a plaintiff must show that: (1) he has asserted a violation of a constitutional right; (2) this right was clearly established at the time of the official’s actions and (3) the official’s actions were objectively unreasonable.
 
 Eugene v. Alief Indep. Sch. Dist.,
 
 65 F.3d 1299, 1305 (5th Cir.1995),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996). Stated alternatively, it must be determined (1) whether the plaintiff has alleged a violation of a clearly established constitutional right under currently applicable constitutional standards, and (2) if the officer’s conduct was unconstitutional, whether it was nevertheless objectively reasonable in light of judicial precedent at the time of the infraction.
 
 Kelly v. Foti, 77
 
 F.3d 819, 821 (5th Cir.1996). The plaintiff must show that the official knew or reasonably should have-known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff.
 
 Harlow, 457
 
 U.S. at 816, 102 S.Ct. at 2737;
 
 Schultea, 47
 
 F.3d at 1431;
 
 see Eugene,
 
 65 F.3d at 1305. The plaintiff must set forth facts underlying the claim, not mere conclusions, before he may subject public officials to trial or to pretrial discovery in a § 1983 case.
 
 Schultea, 47
 
 F.3d at 1430, 1434;
 
 Jacquez,
 
 801 F.2d at 791;
 
 Elliott,
 
 751 F.2d at 1478.
 

 Much of the debate on this point concerns whether Wagner had a clearly established right in the reintegration “agreement” between TAMU and the ORI. Because the court has already determined that Wagner had no constitutionally protectible property interest, there is no need to address the issue of immunity in that context.
 

 The remaining issue is whether Smith and West are immune from Wagner’s claim asserting the deprivation of a liberty interest. Defendants do not contest that the freedom of free speech is a long and clearly established constitutional right. They simply insist that no adverse employment action was taken, and, therefore, West and Smith cannot have been expected to know that their actions violated clearly established rights. The court has determined that Wagner’s adverse
 
 *1321
 
 employment claim asserts a violation of his rights, which the Fifth Circuit deemed clearly established as of 1992. “[T]he law was clearly established [in
 
 Copeland
 
 ] that a retaliatory transfer to a less interesting, less prestigious position could implicate the First Amendment, even if the transfer did not result in a decrease in pay.”
 
 Vojvodich,
 
 48 F.3d at 887 (citing
 
 Copeland,
 
 970 F.2d at 110). Wagner asserts that he was reassigned to a less prestigious and more burdensome teaching position in order to retaliate against him for speaking about the Trulson matter. West and Smith cannot claim that a reasonable official would not have been aware that retaliation for speech of this type would violate an individual’s rights.
 

 In addition to proving the violation of a clearly established right, Wagner must also prove that the Defendants’ conduct was not objectively reasonable in light of the law at the time of the conduct.
 
 Kiser v. Garrett,
 
 67 F.3d 1166, 1170 (5th Cir.1995) (citing
 
 Pfannstiel v. City of Marion,
 
 918 F.2d 1178, 1185 (5th Cir.1990));
 
 Duckett v. City of Cedar Park,
 
 950 F.2d 272, 279 (5th Cir.1992). Because all § 1983 claims arising from events prior to November 30, 1993, are time-barred, there is no need to examine those events further. The Fifth Circuit has described the right to be free from retaliation for exercising free speech rights as being clearly established by 1992 at the latest.
 
 Vojvodich,
 
 48 F.3d at 887. Thus, qualified immunity is not available to Smith and West as to Wagner’s liberty interest claims under § 1983 alleging the abridgment of his First Amendment right to free speech.
 

 D.
 
 Texas Whistleblower Act
 

 Wagner claims that the Defendants have retaliated against him in violation of the Texas Whistleblower Act. According to Wagner, the Defendants’ specific wrongful acts include, without limitation:
 

 forcing Dr. Wagner to resign as Head of the Department, refusing to investigate properly Dr. Wagner’s claims against Dr. Trulson, failing to properly report wrongdoing of Dr. Trulson and lack of wrongdoing by Dr. Wagner, refusing to follow the recommendations of TAMU’s committee of scientists or the ORI to reintegrate Dr. Wagner back into the College of Medicine, stripping Dr. Wagner of his privileges, forcing Dr. Wagner to accept a teaching change into a course in which he has no teaching background, refusing to credit Dr. Wagner with hours he worked, personally attacking Dr. Wagner, refusing to follow through on promises of start-up research funding, ostracizing Dr. Wagner, slandering and libeling Dr. Wagner with false statements, failing to grant any merit increases in salary, and unfairly failing to promote another professor who was connected to Dr. Wagner.
 

 Wagner further asserts that the violations have been continuing in nature, even after this suit was filed. The Defendants contend that Wagner’s claims are time-barred for failure to initiate a grievance or for failure to file suit within the time period required after the conclusion of the grievance procedure.
 

 The Texas Whistleblower Act is remedial in nature and should be liberally construed.
 
 Davis v. Ector County,
 
 40 F.3d 777, 785 (5th Cir.1994);
 
 Stinnett v. Williamson County Sheriff’s Dep’t,
 
 858 S.W.2d 573, 575 (Tex.App.—Austin 1993, writ denied);
 
 Castaneda v. Texas Dep’t of Agric.,
 
 831 S.W.2d 501, 503 (Tex.App. — Corpus Christi 1992, writ denied). Traditionally, the Whistleblower Act has been applied to public employees who were discharged in retaliation for reporting their employer’s violations of law that are detrimental to the public good or to society in general.
 
 Stinnett,
 
 858 S.W.2d at 575. The Act is designed to enhance openness in government and compel the government’s compliance with the law by protecting those who inform authorities of wrongdoing.
 
 Castaneda,
 
 831 S.W.2d at 508.
 

 Section 554.002 of the Whistleblower Act prohibits retaliation for reporting a violation.
 
 See
 
 Tex.Gov’t Code Ann. § 554.002 (Vernon Supp.1996). “To establish a whistle-blower claim, an employee must demonstrate that (a) the employee reported an alleged violation of law to an appropriate law enforcement authority; (b) the employee made the report in good faith; (c) the employer took an adverse employment action against the employee because the employee made the
 
 *1322
 
 report; and (d) the employer’s action proximately caused the employee’s injuries.”
 
 Forsyth v. City of Dallas,
 
 91 F.3d 769, 775 (5th Cir.1996). Section 554.005, entitled “Limitation Period,” provides:
 

 Except as provided by Section 554.006, a public employee who seeks relief under this chapter must sue not later than the 90th day after the date on which the alleged violation of this chapter: (1) occurred; or (2) was discovered by the employee through reasonable diligence.
 

 Tex.Gov’t Code Ann. § 554.005 (Vernon Supp.1996). In § 554.006, entitled “Exhaustion of Grievance or Appeal Procedures,” the Act states:
 

 (a) A public employee must initiate action under the grievance or appeal procedure of the employing state or local governmental entity relating to suspension or termination of employment or adverse employment action before suing under this chapter.
 

 (b) The employee must invoke the applicable grievance or appeal procedures not later than the 90th day after the date on which the alleged violation of this chapter:
 

 (1) occurred; or
 

 (2) was discovered by the employee through reasonable diligence.
 

 (c) Time used by the employee in acting under the grievance or appeal procedures is excluded, except as provided by Subsection (d), from the period established by Section 554.005.
 

 (d) If a final decision is not rendered before the 61st day after the date procedures are initiated under Subsection (a), the employee may elect to:
 

 (1) exhaust the applicable procedures under Subsection (a), in which event the employee must sue not later than the 30th day after the date those procedures are exhausted to obtain relief under this chapter; or
 

 (2) terminate procedures under Subsection (a), in which event the employee must sue within the time remaining under Section 554.005 to obtain relief under this chapter.
 

 Tex.Gov’t Code Ann. § 554.006 (Vernon Supp.1996). Because the Whistleblower Act was amended effective June 15, 1995, the events in the case at bar must be examined in relation to the effective date of the amendment.
 
 See
 
 Tex.Gov’t Code Ann. § 554.001
 
 et seq.
 
 (Vernon Supp.1996).
 

 1.
 
 Wagner’s Pre-June 15, 1995, Claims
 

 Events occurring before June 15, 1995, are subject to the previous version of § 554.006. The ninety-day requirement for bringing suit contained in § 554.005, however, was in effect prior to the 1995 amendment. With respect to exhaustion of grievance or appeal procedures, the preamendment version of § 554.006 provided:
 

 (a) An employee of a local government must exhaust that government’s grievance or appeal procedure relating to suspension or termination of employment or unlawful discrimination before suing under this chapter.
 

 (b) The employee must invoke the grievance or appeal procedures not later than the 90th day after the date on which the alleged violation of this chapter:
 

 (1) occurred; or
 

 (2) was discovered by the employee
 

 through reasonable diligence.
 

 (c) Time used by the employee in exhausting the grievance or appeal procedures is excluded from the period established by Section 554.005.
 

 (d) This section does not apply if a final decision is not rendered before the 31st day after the date on which the employee initiated the grievance or appeal.
 

 Thus, the Act required only local government employees to exhaust administrative remedies. Other public employees were not required to file grievances and were not entitled to the resultant limitation-tolling provisions.
 
 See
 
 Acts 1993, 73rd Leg., R.S., ch. 268, § 1,
 
 amended by
 
 Acts 1995, 74th Leg., R.S., eh. 721, § 6. Contrary to Wagner’s assertions, § 554.006 is inapplicable in this situation. Wagner concedes in his supplemental brief that he is an employee of a state agency, not of a local government. Therefore, under the express terms of § 554.006 in effect at that time, Wagner was
 
 *1323
 
 not included within the category of employees for whom the resort to grievance procedures was mandatory and equitable tolling was available.
 

 Assuming
 
 arguendo
 
 that § 554.006 applied and that Wagner participated in some form of grievance proceeding, Wagner was informed by letter dated August 16, 1994, from the President of TAMU, “While it is regrettable that you believe you have been wronged, the University will take no further action regarding your case. The matter is considered closed.” Thus, as the Defendants correctly point out, despite any equitable tolling to which he may have been entitled, Wagner still was obligated to bring his claim within ninety days after the termination of the “grievance proceeding.” Exhaustion of internal remedies was not a prerequisite for bringing suit if the procedure was not completed within thirty-one days.
 
 Turner v. Richardson Indep. Sch. Dist.,
 
 885 S.W.2d 553, 560 (Tex.App. — Dallas 1994, writ denied). Wagner did not file this action, however, until November 30, 1995. Although Perry stated at deposition that Wagner can still file a grievance at TAMU, this is contrary to Wagner’s assertion that an internal grievance procedure is still on-going. It demonstrates, however, that the grievance procedure at TAMU remains available to Wagner.
 

 Therefore, under the pre-amendment version of the Act, Wagner was required to file suit within ninety days of the occurrence or the discovery of any adverse employment action. Wagner, however, did not file suit until November 30, 1995, months or years after the disputed actions occurred. Thus, Wagner’s whistleblower claims relating to events prior to June 15, 1995, are barred by limitations.
 

 2.
 
 Events Occurring after June 15, 1995
 

 The current version of the Whistleblower Act is applicable only to those adverse personnel actions occurring on or after the effective date of the Act, June 15,1995. Whistle-blower Act, 74th Leg., R.S., ch. 721, § 11. As previously noted, § 554.006 requires a public employee to initiate action under the agency’s grievance procedure not later than the ninetieth day after the alleged adverse action. Tex.Gov’t Code Ann. § 554.006(a) and (b) (Vernon Supp.1996). If a final decision is not rendered internally before the sixty-first day after the grievance was filed, the employee may choose either to exhaust those procedures and sue within thirty days after their exhaustion or terminate those procedures and sue within the time remaining on the ninety-day period. TexGov’t Code Ann. § 554.006(d)(1) and (2) (Vernon Supp. 1996). If the employee chooses the latter, he still must bring suit within ninety days after the occurrence or discovery of the alleged adverse action; however, the ninety-day period is tolled during the time he was pursuing the internal grievance procedure.
 
 Id.
 

 Here, because Wagner brought suit on November 30, 1995, he may raise claims of adverse employment actions taken against him during the ninety days preceding November 30, 1995,
 
 ie.,
 
 those actions taken after August 30, 1995. If Wagner invoked the grievance procedure, this ninety-day period would be extended by the amount of time he spent pursuing the internal grievance. In no event would the grievance procedure toll the statute beyond June 15,1995, the effective date of the amendments. Thus, it must be determined whether the statute of limitations was tolled from June 15, 1995 to August 30,1995.
 

 The Defendants assert that Wagner never filed a formal grievance, and, therefore any events occurring more than ninety days before November 30,1995, are time-barred. In response to the motion for summary judgment and in supplemental briefing, Wagner claims that when he engaged in settlement negotiations with TAMU, he believed he was utilizing an internal grievance procedure. At Wagner’s deposition, however, the following exchange took place:
 

 Q: Did you ever file a grievance with Texas A & M University?
 

 A: Did I ever fill out a form that says this is the formal grievance procedure that I will follow?
 

 Q: Okay.
 

 A: I did not do that, if that’s what you’re asking.
 

 
 *1324
 
 The Defendants attached to their reply brief, as Exhibit “1,” TAMU Faculty Grievance Procedures. The Defendants assert that these procedures provide a specific course to be followed by faculty members who have a grievance. The Defendants contend that, in contrast to Wagner’s current depiction of the settlement negotiations, at the time they were on-going, Wagner referred to negotiating a “settlement agreement” with TAMU. In a memorandum from Wagner to Perry dated June 22, 1993, Wagner submitted a settlement demand and used the term “settlement agreement” three times. Letters from Wagner’s representative, Charles Zucker (“Zueker”) — Executive Director of the Texas Faculty Association, indicate Wagner’s awareness that he was engaged in settlement negotiations. A letter dated June 10, 1994, from Zueker to the Chancellor of TAMU listed Wagner’s settlement demands. Another letter from Zueker, dated September 2, 1994, to the ORI stated that TAMU “declined to meet Dr. Wagner’s request for a retirement settlement of $325,000.” Yet, Wagner contends that the negotiation and reintegration process, “arbitrated” by Perry, was an
 
 ad hoc
 
 grievance procedure, entitling him to tolling under the Act. The Defendants argue, however, that a grievance must be properly filed under TAMU’s official, ■written grievance procedure and that the negotiation process did not entail a properly filed grievance.
 

 Neither the Texas Government Code nor Texas jurisprudence offers insight into whether an “unofficial”
 
 ad hoc
 
 grievance procedure has the same tolling effect as an official, systematic procedure. Paragraph (a) of § 554.006 simply states that employees must “initiate action under the grievance or appeal procedures” of the entity involved. Tex.Gov’t Code Ann. § 554.006(a) (Vernon Supp.1996). The use of the plural “procedures” implies that the Act does not contemplate that a single, systematic method is necessary to toll limitations. The purposes of the Act are better effectuated by an interpretation that allows those state entities ■which do not have clearly written procedures to use their own informal procedures. Further, to the extent that Wagner must follow TAMU’s formal grievance procedure, it does not encompass the claims that Wagner makes. The “Faculty Grievance Procedures” document offered by the Defendants states that it applies to disputes “Not Concerning Questions of Tenure, Dismissal, or Constitutional Rights.” Wagner’s dispute centers around the alleged violation of his First Amendment rights to speak freely on matters of public concern.
 

 In any event, the first activity alleged by Wagner during this two and a half month period was his occasional appearance in the office while he was classified as being on ftdl-time leave under the FMLA. Wagner does not allege that any adverse employment action relating to his part-time work occurred until TAMU refused to credit him for days worked, a decision that was made in December 1995. As to the merits of this claim, the Defendants assert as an affirmative defense under § 554.004(b) that TAMU would have taken the action,
 
 ie.,
 
 denying credit for these hours, based solely on information, observation, or evidence that is not related to the fact that Wagner allegedly blew the whistle.
 

 By letter dated June 16, 1996, Wagner’s counsel, Gaines, notified TAMU’s General Counsel that Wagner had developed a chronic, serious health condition requiring leave under the FMLA. Attached to the letter was a note from Wagner’s doctor, Dr. Gary R. Newsome (“Newsome”), which stated that Wagner was not to return to work until significant improvement occurred. In a subsequent letter, dated July 11, 1995, Gaines again notified TAMU’s General Counsel that Newsome had required Wagner not to return to work until his condition improved in order to protect his health. Additionally, on July 26,1995, Wagner submitted a report in which Newsome stated that Wagner was unable to work at that time. Wagner has not produced evidence of any subsequent medical certification that he submitted to TAMU, as required by TAMU in accordance with the FMLA, clearing him to return to work part-time. The regulations enacted under the FMLA permit an employer to require an employee, whose FMLA leave was occasioned by the employee’s own serious health condition, as a condition for restoring his job, to present
 
 *1325
 
 certification from the employee’s health care provider that the employee is able to resume work.
 
 See
 
 29 C.F.R. § 825.310. Hence, absent evidence that the certification requirement was applied differently to Wagner than to non-whistleblowers, the Defendants are entitled to rely on this requirement as an affirmative defense. Moreover, Newsome’s letters support TAMU’s contention that Wagner was unable to work during this time period, and, hence, could not have worked part-time as he claimed. Thus, summary judgment is warranted as to Wagner’s claim for credit for days allegedly worked while on medical leave.
 

 Other events urged by Wagner during the time period from June 15, 1995 to August 30,1995, include his continual “pressing” of his desire to teach Neuroanatomy, negotiating the draft of a full disclosure of the “Trulson Affair,” and general reintegration efforts. All of these events, however, began prior to the June 15, 1995, amendments. As such, they are governed by the prior Act and cannot be preserved by any alleged on-going grievance procedure.
 

 With respect to Wagner allegedly being forced to accept a teaching reassignment from Neuroanatomy to Microanatomy on September 15, 1995, the Defendants assert that this does not rise to the level of an adverse employment action. The Defendants also assert as an affirmative defense under § 554.004(b) that they would have reassigned Wagner based solely on information, observation, or evidence that is not related to the fact that Wagner purportedly blew the whistle. In support of their contention that they would have reassigned Wagner in any event, the Defendants cite to memoranda from West to Wagner dated April 21, and May 11, 1995, explaining that because Wagner was absent from the Neuroanatomy Department for two years, West looked elsewhere to staff the course. Although West acknowledged that Wagner’s leave involved sick leave, negotiation for retirement, and faculty development, he contends that because the Neuroanatomy course was fully staffed he could not back out of those assignments. Fact questions exist, however, as to the whether another Neuroanatomy faculty member more properly could have been reassigned rather than Wagner and whether Wagner would have been absent from the Neuroanatomy Department for two years had he not reported Trulson and allegedly been retaliated against for doing so. Because outstanding issues of material fact exist with respect to Wagner’s claims of retaliation in violation of the Whistleblower Act with regard to his teaching reassignment, this issue will proceed to trial.
 

 E.
 
 Negligent and Intentional Infliction of Emotional Distress
 

 In ¶ 37 of his second amended complaint, Wagner alleges that Defendants West and Smith “acted negligently, or, in the alternative, intentionally or recklessly for the purpose of humiliating and demeaning Dr. Wagner and subjecting him to public ridicule.” Wagner further claims that the conduct of West and Smith was “so extreme and outrageous in character as to go beyond all possible bounds of decency.” Wagner contends that, as a result, he has suffered damages to his health, his business, his reputation, and severe emotional distress. Additionally, Wagner maintains that he has experienced severe disappointment, indignation, wounded pride, shame, despair, and depression, as well as post traumatic stress syndrome, due to his treatment by the Defendants. Wagner asserts that he is now diagnosed as having clinical depression and post traumatic stress syndrome allegedly directly caused by the Defendants’ actions.
 

 1.
 
 Negligent Infliction of Emotional Distress
 

 Wagner’s claim for negligent infliction of emotional distress is not cognizable under Texas law. Texas does not recognize the tort of negligent infliction of emotional distress.
 
 Hirras v. National R.R. Passenger Corp.,
 
 44 F.3d 278, 280 n. 3 (5th Cir.1995) (citing
 
 Boyles v. Kerr,
 
 855 S.W.2d 593, 597 (Tex.1993));
 
 Daniels v. Equitable Life Assurance Soc’y,
 
 35 F.3d 210, 215 n. 8 (5th Cir.1994);
 
 Watkins v. Fibreboard Corp.,
 
 994 F.2d 253, 258 (5th Cir.1993);
 
 Garza v. United States, 881
 
 F.Supp. 1103, 1108 (S.D.Tex. 1995);
 
 Kipp v. LTV Aerospace & Defense,
 
 838 F.Supp. 289, 294 (N.D.Tex.1993). Wag
 
 *1326
 
 ner cites no cases or authority to support the proposition that this court should recognize such a claim under these circumstances. Therefore, the Defendants are entitled to summary judgment on Wagner’s claim for negligent infliction of emotional distress.
 

 2.
 
 Intentional Infliction of Emotional Distress
 

 To prevail on his claim of intentional infliction of emotional distress, Wagner must establish: (1) the Defendants acted intentionally or recklessly; (2) the Defendants’ conduct was extreme and outrageous; (3) the Defendants’ actions caused him emotional distress; and (4) the emotional distress he suffered was severe.
 
 Burden v. General Dynamics Corp.,
 
 60 F.3d 213, 218 (5th Cir. 1995);
 
 MacArthur v. University of Tex. Health Ctr.,
 
 45 F.3d 890, 898 (5th Cir.1995);
 
 McKethan v. Texas Farm Bureau,
 
 996 F.2d 734, 742 (5th Cir.1993),
 
 cert. denied,
 
 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994);
 
 Ugalde v. W.A. McKenzie Asphalt Co.,
 
 990 F.2d 239, 243 (5th Cir.1993);
 
 Ramirez v. Allright Parking El Paso, Inc.,
 
 970 F.2d 1372, 1375 (5th Cir.1992);
 
 Johnson v. Merrell Dow Pharmaceuticals, Inc.,
 
 965 F.2d 31, 33 (5th Cir.1992);
 
 Dean v. Ford Motor Credit Co.,
 
 885 F.2d 300, 306 (5th Cir.1989);
 
 Randall’s Food Mkts., Inc. v. Johnson,
 
 891 S.W.2d 640, 644 (Tex.1995) (citing
 
 Twyman v. Twyman,
 
 855 S.W.2d 619, 621-22 (Tex. 1993));
 
 Wornick Co. v. Casas,
 
 856 S.W.2d 732, 734 (Tex.1993).
 

 While “extreme and outrageous,” as used in the second element of this standard is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is “outrageous” if it is “atrocious” and surpasses “all possible bounds of decency,” such that it is “utterly intolerable in a civilized community.”
 
 See MacArthur,
 
 45 F.3d at 898;
 
 Ugalde,
 
 990 F.2d at 243;
 
 Johnson,
 
 965 F.2d at 33;
 
 Dean,
 
 885 F.2d at 306;
 
 Randall’s Food Mkts., Inc.,
 
 891 S.W.2d at 644;
 
 Womick,
 
 856 S.W.2d at 734. In
 
 Dean,
 
 the Fifth Circuit (citing Restatement (Second) of Torts § 46, comment d (1965)) stated:
 

 Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community---- Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, “Outrageous.”
 

 885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
 
 Ugalde,
 
 990 F.2d at 243;
 
 Johnson,
 
 965 F.2d at 33;
 
 Wilson v. Monarch Paper Co.,
 
 939 F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone’s feelings are hurt.
 
 Id.
 

 Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for “mere employment disputes.”
 
 MacArthur,
 
 45 F.3d at 898;
 
 Johnson,
 
 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees.
 
 Id.
 
 at 34;
 
 Wilson,
 
 939 F.2d at 1143. Even actions that may be illegal in an employment setting may not be the sort of behavior that constitutes “extreme and outrageous” conduct for purposes of an intentional infliction of emotional distress claim.
 
 Ugalde,
 
 990 F.2d at 243;
 
 see Honea v. SGS Control Servs., Inc.,
 
 859 F.Supp. 1025, 1031 (E.D.Tex. 1994);
 
 Sebesta v. Kent Elecs. Corp.,
 
 886 S.W.2d 459, 462-63 (Tex.App.—Houston [1st Dist.] 1994, writ denied).
 

 In their motion for summary judgment, the Defendants correctly note that to be actionable, any such actions must have occurred after November 30, 1993, because claims for intentional infliction of emotional distress are subject to a two-year statute of limitations.
 
 See
 
 Tex.Civ.Prac.
 
 &
 
 Rem.Code Ann. § 16.003(a);
 
 Twyman,
 
 855 S.W.2d at 625;
 
 Bhalli v. Methodist Hosp.,
 
 896 S.W.2d 207, 211 (Tex.App. — Houston [1st Dist.] 1995, writ denied). The Defendants contend that Wagner has failed to show that any of the Defendants’ conduct was “extreme and outrageous.” The Defendants observe that
 
 *1327
 
 Wagner merely claims in Ms second amended complaint that West and Smith acted “intentionally and recklessly for the purpose of humiliating and demeaning Dr. Wagner and subjecting him to public ridicule.” The Defendants argue that Wagner has not alleged that he was disciplined or discharged, nor has he specifically described any atrocious affronts to Ms dignity.
 

 In Ms response to the Defendants’ motion for summary judgment, Wagner maintains that the January 1993 Milford Committee Report found that Ms reputation had been damaged, that he was forced to step down as Department Head, that he was accused of criminal activities and character flaws, and that he was ostracized. Wagner also suggests that he need not meet the traditional requirements for an intentional infliction of emotional distress claim because the Defendants possessed an outrageous motive to retaliate against a whistleblower. Wagner declares in Ms response that he “did nothing but seek the truth in the scientific community. He had nothing to gain. The result was a brain-numbing pounding from the College from 1987-93, as found by the Milford Committee, and even further and more outrageous attacks since then.”
 

 Although Wagner may be suffering from emotional distress, he has not shown any extreme and outrageous conduct by the Defendants during the relevant time period. As noted above, only events that occurred after November 30, 1993, fall within the applicable statute of limitations. The Milford Committee Report addresses actions that occurred prior to January 13, 1993. The conduct alleged by Wagner after November 30, 1993, is far less egregious that other actions found not to constitute intentional infliction of emotional distress as matter of law in a number of cases.
 
 See, e.g., Ramirez,
 
 970 F.2d at 1376-77;
 
 Johnson,
 
 965 F.2d at 34;
 
 Guthrie v. Tifco Indus.,
 
 941 F.2d 374, 379 (5th Cir.1991),
 
 cert. denied,
 
 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992);
 
 Clayton v. Nabisco Brands, Inc.,
 
 804 F.Supp. 882, 888 (S.D.Tex.1992);
 
 Horton v. Montgomery Ward & Co.,
 
 827 S.W.2d 361, 369 (Tex.App.—San Antomo 1992, writ demed). Only in the most unusual of situations does conduct move out of the “realm of an ordinary employment dispute,” into the classification of “extreme and outrageous,” as required for the tort of intentional infliction of emotional distress.
 
 Prunty v. Arkansas Freightways, Inc.,
 
 16 F.3d 649, 654 (5th Cir.1994) (quoting
 
 Dean,
 
 885 F.2d at 305). Indeed,
 
 Wagner
 
 does not state with specificity any particular acts or conduct by the Defendants that he deems to be extreme but rather makes conclusory allegations of “outrageous attacks.” While the Defendants’ actions may have been thoughtless and perhaps unlawful under other theories, their conduct was not so vile and reprehensible that it surpassed “all possible bounds of decency” or can be viewed as “utterly intolerable in a civilized community.” Under these circumstances, summary judgment is proper as to Wagner’s claim for intentional infliction of emotional distress.
 

 F.
 
 Defamation
 

 Wagner asserts in Ms second amended complaint that Smith made unprivileged slanderous and libelous false statements, causing severe damage to Ms physical and emotional state, to Ms reputation, and to Ms business. Wagner’s allegations stem from a December 1995 memorandum written by Smith to Wagner and copied to four other individuals. In the memorandum, Smith informed Wagner that the Neuroanatomy Course Coordinator had expressed concern for the safety of the Neuroanatomy faculty and the enrolled students should Wagner be permitted to “interact with the course.” In addition, Smith stated that Wagner had made threatening statements to other faculty members regarding the use of firearms. Smith directed Wagner not to attend the lectures or laboratories for the Neuroanatomy course. Although the memorandum to Wagner was stamped “confidential,” Gelderd, Perry, West, and Prescott received copies. Gelderd was the Course Coordinator for Neuroanatomy. Perry was the Associate Provost and Dean of Faculties who was assigned by the President of TAMU to work with the College of Medicine and Wagner to resolve Wagner’s difficulties with TAMU. West was the Head of Wagner’s Department who reassigned Wagner. Prescott was special assistant to the Executive Vice President and Provost
 
 *1328
 
 who assisted both Perry and the General Counsel in addressing Wagner’s concerns.
 

 A statement is defamatory if it tends to harm the reputation of a person, lower the person in the estimation of the community, deter third persons from associating or dealing with him or her, or tends to expose the person to public hatred, contempt, or ridicule.
 
 Hardwick v. Houston Lighting & Power Co.,
 
 881 S.W.2d 195, 197 (Tex.App.—Corpus Christi 1994, writ dism’d w.o.j.). Libel is a written defamatory statement which tends to injure a person’s reputation, thus exposing him to “public hatred, contempt, ridicule, or financial injury, or impeach any person’s honesty, integrity, virtue, or reputation.”
 
 See
 
 Tex.Civ.Prac.
 
 &
 
 Rem. Code Ann. § 73.001;
 
 Halbert v. City of Sherman,
 
 33 F.3d 526, 530 (5th Cir.1994) (quoting
 
 Sellards v. Express-News Corp.,
 
 702 S.W.2d 677, 679 (Tex.App.—San Antonio 1985, writ refd n.r.e.));
 
 Cain v. Hearst Corp.,
 
 878 S.W.2d 577, 580 (Tex.1994);
 
 Musser v. Smith Protective Servs., Inc.,
 
 723 S.W.2d 653, 654-55 (Tex.1987);
 
 Leyendecker & Assocs., Inc. v. Wechter,
 
 683 S.W.2d 369, 374 (Tex.1984). Slander is a defamatory statement published orally to a third person without legal excuse.
 
 Halbert,
 
 33 F.3d at 530;
 
 Randall’s Food Mkts., Inc.,
 
 891 S.W.2d at 646.
 

 1.
 
 Sovereign Immunity
 

 Smith contends that the doctrine of sovereign immunity precludes a defamation claim against him in his official capacity.
 

 Under Texas law, a suit against a state officer in his official capacity is a suit against the state.
 
 Liberty Mut. Ins. Co. v. Sharp,
 
 874 S.W.2d 736, 737 (TexApp.—Austin 1994, writ denied);
 
 Pickell v. Brooks,
 
 846 S.W.2d 421, 425 (TexApp.—Austin 1992, writ denied). Officials acting in their official capacity enjoy the same immunity as the state itself.
 
 Bowles v. Reed,
 
 913 S.W.2d 652, 655 (TexApp.—Waco 1995, writ denied);
 
 Dear v. City of Irving,
 
 902 S.W.2d 731, 735 (Tex.App. — Austin 1995, writ denied). The Texas Tort Claims Act “waives governmental immunity in three general areas: use of publicly owned vehicles, premises defects, and injuries arising from conditions or use of property.”
 
 City of Hempstead v. Kmiec,
 
 902 S.W.2d 118, 122 (TexApp.—Houston [1st Dist.] 1995, no writ) (citing Tex.Civ.Prac. & Rem.Code Ann. § 101.021;
 
 Salcedo v. El Paso Hosp. Dist.,
 
 659 S.W.2d 30, 31 (Tex. 1983)). Defamatory statements, even when they are reduced to tangible property in the form of documents, do not escape sovereign immunity.
 
 See Dallas County v. Harper,
 
 913 S.W.2d 207, 207-08 (Tex.1995) (citing
 
 University of Tex. Medical Branch v. York,
 
 871 S.W.2d 175, 179 (Tex.1994)). Furthermore, the Texas Tort Claims Act does not waive immunity for intentional torts such as defamation.
 
 Kmiec,
 
 902 S.W.2d at 122 (citing Tex.Civ.Prac.
 
 &
 
 Rem.Code Ann. § 101.057(2)).
 

 Because there has been no statutory or legislative consent for a defamation suit against Smith in his official capacity, summary judgment is appropriate on this claim.
 

 2.
 
 Official Immunity
 

 Smith also claims that Wagner’s defamation claim against him in his individual capacity is barred under the doctrine of official immunity.
 

 Official immunity is an affirmative defense in Texas.
 
 City of Beverly Hills v. Guevara,
 
 911 S.W.2d 901, 903 (TexApp.—Waco 1995, no writ);
 
 Kmiec,
 
 902 S.W.2d at 120;
 
 Perry v. Texas A & I Univ.,
 
 737 S.W.2d 106, 110 (TexApp.—Corpus Christi 1987, writ refd n.r.e.). When a defendant moves for summary judgment on an affirmative defense, the burden is on the defendant to establish all of the elements as a matter of law.
 
 Saldana v. Garza,
 
 684 F.2d 1159, 1162-63 and n. 14 (5th Cir.1982),
 
 cert. denied,
 
 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983);
 
 Howard v. Vandiver,
 
 731 F.Supp. 1290, 1295 n. 17 (N.D.Miss.1990). “Under Texas law, ‘[government officials are entitled to immunity from suit arising from performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority.’ ”
 
 Cantu v. Rocha,
 
 77 F.3d 795, 808 (5th Cir.1996) (quoting
 
 City of Lancaster v. Chambers,
 
 883 S.W.2d 650, 653 (Tex.1994);
 
 Kmiec,
 
 902 S.W.2d at 120;
 
 Albright v. Texas Dep’t of Human Servs.,
 
 859 S.W.2d 575, 579 (Tex.App.—Houston [1st Dist.] 1993, no writ);
 
 *1329
 

 Boozier v. Hambrick,
 
 846 S.W.2d 593, 597 (Tex.App.—Houston [1st Dist.] 1993, no writ).
 

 In the ease at bar, Smith was acting within the scope of his authority when he wrote the allegedly defamatory memorandum concerning Wagner’s supposed threats with firearms. In an affidavit attached to the Defendants’ motion for summary judgment, Smith describes some of his duties as “protecting the welfare of students and faculty and ensuring the quality of education received by students in the College of Medicine.” The memorandum from Smith directing Wagner not to attend Neuroanatomy class describes warnings from another faculty member that Wagner’s presence would be a disruption to the class because of Wagner’s prior belligerent statements that no one ought to change the course “if they know what’s good for them.” It was within Smith’s duties as the Dean of the College of Medicine to issue directives addressing the effectiveness of teaching and safety of faculty and students attending class.
 

 Smith also was performing a discretionary act when he wrote the memorandum. Immunity attaches to state employment that involves discretionary, rather than ministerial, acts.
 
 Albright,
 
 859 S.W.2d at 579. “Discretionary acts require deliberation, decision and judgment, whereas ministerial acts involve ‘obedience to orders, or the performance of a duty as to which the actor is left no choice.’ ”
 
 Id.
 
 (quoting
 
 Baker v. Story,
 
 621 S.W.2d 639, 645 (Tex.App.—San Antonio 1981, writ refd n.r.e.));
 
 see Chambers,
 
 883 S.W.2d at 654;
 
 City of Dallas v. Half Price Books, Records, Magazines, Inc.,
 
 883 S.W.2d 374, 376 (Tex.App.—Dallas 1994, no writ). There is no evidence that any policies, rules, or directives required Smith to write the memorandum to Wagner. Smith’s composition of the memorandum and subsequent copying of it to additional interested parties was completely within his discretion, as it required deliberation, decision, and judgment.
 

 Finally, Smith contends that he acted in good faith when he wrote the memorandum. In
 
 Chambers,
 
 the Texas Supreme Court clarified the good faith standard in official immunity cases. 883 S.W.2d at 656. “[A]n officer acts in good faith if a ‘reasonably prudent officer, under the same or similar circumstances, could have believed that’ his acts were justified.”
 
 Half Price Books, Records, Magazines, Inc.,
 
 883 S.W.2d at 377 (quoting
 
 Chambers,
 
 883 S.W.2d at 656);
 
 see Kmiec,
 
 902 S.W.2d at 121. The test for good faith is one of objective, legal reasonableness.
 
 Chambers,
 
 883 S.W.2d at 656;
 
 Gallia v. Schreiber,
 
 907 S.W.2d 864, 869 (Tex.App.—Houston [1st Dist.] 1995, no writ).
 

 Here, faculty members had expressed concerns to Smith about possible threats from Wagner. Attached to the defendants’ motion for summary judgment are affidavits by Gelderd, Black, and Wayne Sampson (“Sampson”). In Gelderd’s affidavit, he stated, among other things, “He [Wagner] contacted me while I was on sabbatical and threatened that I had better not make any changes in the course [neuroanatomy] if I ‘knew what was good’ for me.” Gelderd further stated that he “believed this to be his way of attempting to intimidate me with threats of violence.” According to Gelderd, he communicated all of these matters to Smith because it was his belief that Wagner “posed a threat of violence to me and others.” Black stated in his affidavit that Wagner went to his office and revealed to him that he thought violence could break out on the second floor. Black stated that Wagner’s concerns related to violence from Trulson. Black further stated in his affidavit, “Dr. Wagner made me aware at that time that he (Dr. Wagner) was armed with a weapon and asked me something of the general nature of ‘how do you feel about sitting across from someone who is armed.’ ” Black asserted that “[t]his did have an intimidating and unnerving effect” that left me concerned about his having a weapon on his body in the College of Medicine, but I did not feel personally threatened. Sampson stated in his affidavit that, when Wagner visited him at his laboratory and Sampson asked him if he was carrying a gun, Wagner indicated that he was and that he carried one all the time. Sampson asserted in his affidavit that later the same day, Wagner called him into his office and told him that he did not want Trulson and Gelderd to use his labora
 
 *1330
 
 tory for “clandestine meetings.” Sampson stated that Wagner told him, “If you know what’s good for you, you will not allow these clandestine meetings in your laboratory.” Sampson stated that Wagner said this while he “patted the side of his coat where he had earlier indicated that he was carrying a gun.” Sampson viewed this as a threat against him and communicated this incident to Smith. Based on Gelderd’s, Black’s, and Sampson’s affidavits, it was reasonable for a supervisor in Smith’s position to prohibit Wagner from participating in the Neuroanatomy course and to write a memorandum to him explaining this prohibition, as well as to advise interested parties of his action.
 

 In order to defeat a motion for summary judgment based on official immunity, “the nonmovant must show that ‘no reasonable person could have thought the facts were such that they justified the defendant’s acts.’”
 
 Kmiec,
 
 902 S.W.2d at 121 (quoting
 
 Chambers,
 
 883 S.W.2d at 657). “In other words, ‘if officers of reasonable competence could disagree on this issue, immunity should be recognized.’ ”
 
 Id.
 
 Here, Wagner merely contends that Smith had a job duty to prevent the spreading of unfounded rumors about Wagner because the Milford Committee report directed TAMU to prevent such rumors. Wagner suggests that if such were the case, Smith could not be acting within his duties by writing a letter that perpetuated an allegedly unfounded rumor. Wagner offers a 1993 letter from E. Dean Gage, Senior Vice President and Provost at TAMU, which includes the following assurance to the OSI:
 

 The President of Texas A & M University will, by memorandum, notify Dr. Richard DeVaul [Smith’s predecessor] as chief administrative officer of the College of Medicine, that the University will assiduously protect Dr. Wagner’s reputation. The Dean of Faculties [Perry] will be charged to oversee compliance. Dr. Wagner will be asked to meet regularly with the Dean of Faculties to ensure maximum communications on these matters.
 

 This statement falls short of defining one of Smith’s duties as the protection of Wagner’s reputation. The letter may place a duty on Perry and TAMU, but not on Smith, personally, as the administrative officer of the College of Medicine. Further, while the passage perhaps suggests that Smith had an obligation to protect Wagner’s reputation, it in no way implies that it was an absolute duty. The passage does not establish that Smith had a duty to protect Wagner’s reputation when doing so would compromise his other duties,
 
 e.g.,
 
 to ensure teaching effectiveness and the safety of other faculty members and students. Because Smith, as the Dean of the College of Medicine, was not specifically charged with overseeing compliance, he did not exceed the scope of his authority by perpetuating a rumor, regardless of its truth. Most importantly, it cannot be said that no reasonable person could have thought that the incidents communicated to Smith would have justified his writing the memorandum. Smith’s actions were not so far removed from an appropriate response to reports he had received from faculty members to be deemed unreasonable
 
 per se.
 
 At a minimum, school officials of reasonable competence could disagree on this issue. Under these circumstances, official immunity must be accorded to Smith.
 

 Accordingly, Wagner’s defamation claim against Smith in his individual capacity is barred under the doctrine of official immunity- .
 

 3.
 
 Qualified Privilege
 

 In the alternative, Smith maintains that even if he were acting outside the scope of his authority, his statements are protected by a qualified privilege.
 

 Under Texas law, “a communication made on a subject matter in which the person making it has an interest is privileged if made to persons having a corresponding interest or duty.”
 
 Danawala v. Houston Lighting & Power Co.,
 
 14 F.3d 251, 254 (5th Cir.1993) (citing
 
 Boze v. Branstetter,
 
 912 F.2d 801, 806 (5th Cir.1990));
 
 see Duffy v. Leading Edge Prod., Inc.,
 
 44 F.3d 308, 312 (5th Cir.1995). “This privilege protects statements made by an employer concerning an employee.”
 
 Danawala,
 
 14 F.3d at 254 (citing
 
 Bergman v. Oshman’s Sporting Goods, Inc.,
 
 594 S.W.2d 814, 816 (Tex.Civ.App.—Tyler 1980, no writ)). A qualified
 
 *1331
 
 privilege is “ ‘based on a public policy that recognizes the need for the free information to protect business and personal interests. To encourage open communication, it is necessary to afford protection from lability for misinformation given in an appropriate effort to protect or advance the interests involved.’”
 
 Id.
 
 (quoting
 
 Gaines v. CUNA Mut. Ins. Soc’y,
 
 681 F.2d 982, 986 (5th Cir. 1982)).
 

 A party loses his qualified privilege when he acts with “actual malice.”
 
 ContiCommodity Servs., Inc. v. Ragan,
 
 63 F.3d 438, 442 (5th Cir.1995),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996);
 
 Duffy,
 
 44 F.3d at 312-13;
 
 Danawala,
 
 14 F.3d at 254;
 
 Seidenstein v. National Medical Enter., Inc., 769
 
 F.2d 1100, 1103-04 (5th Cir. 1985);
 
 Gaines,
 
 681 F.2d at 986;
 
 Hurlbut v. Gulf Atlantic Life Ins. Co.,
 
 749 S.W.2d 762, 768 (Tex.1987). To show actual malice, Wagner must show that Smith published the statement knowing it to be false or with a high degree of awareness of its probable falsity.
 
 See Danawala,
 
 14 F.3d at 255 (citing
 
 Seidenstein, 769
 
 F.2d at 1104);
 
 Carr v. Brasher,
 
 776 S.W.2d 567, 571 (Tex.1989);
 
 Casso v. Brand,
 
 776 S.W.2d 551, 558 (Tex. 1989). “Actual malice in the defamation context does not include ill will, spite or evil motive, but rather requires ‘sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.’ ”
 
 Hagler v. Proctor & Gamble Mfg. Co.,
 
 884 S.W.2d 771, 772 (Tex.1994) (quoting
 
 Casso,
 
 776 S.W.2d at 558);
 
 see ContiCommodity Servs., Inc.,
 
 63 F.3d at 442-43;
 
 Carr, 776
 
 S.W.2d at 571. Once any underlying factual disputes are resolved, whether a qualified privilege exists is a question of law.
 
 Danawala,
 
 14 F.3d at 254;
 
 Boze,
 
 912 F.2d at 806;
 
 Schauer v. Memorial Care Sys.,
 
 856 S.W.2d 437, 449 (Tex.App.—Houston [1st Dist.] 1993, no writ) (citing
 
 Houston v. Grocers Supply Co.,
 
 625 S.W.2d 798, 800 (TexApp.—Houston [14th Dist.] 1981, no writ)).
 

 In this case, Smith maintains that the limited number of TAMU officials who received the memorandum had an interest in Wagner’s status. The letter contained comments about an employee, Wagner, and was directed only to the following individuals: Wagner; Gelderd — the Course Coordinator for Neuroanatomy; Perry — the Associate Provost and Dean of Faculties who was assigned by the President of TAMU to work with the College of Medicine and Wagner to resolve Wagner’s difficulties with TAMU; Prescott — Special Assistant to the Executive Vice President and Provost who assisted both Perry and the General Counsel in addressing Wagner’s concerns; and West— Head of the Department who reassigned Wagner. As the Defendants correctly point out, each of these people had an interest or duty in the matters which the letter addressed. “Accusations against an employee by his employer or another employee, made to a person having a corresponding interest or duty in the matter to which the communication relates, are qualifiedly privileged.”
 
 Bergman,
 
 594 S.W.2d at 816.
 

 Wagner does not dispute the potential applicability of the privilege. Instead, Wagner alleges that Smith acted in bad faith when he wrote the 1995 memorandum. The relevant paragraph of that memorandum reads:
 

 I [Smith] have been notified by the course coordinator for the Neuroanatomy course [Dr. John Gelderd] that you [Wagner] have made threats to him and to other faculty members. He cites your conversation with him in which you state that no one will change anything in the Neuroanatomy course “if they know what’s good for them.” The course coordinator expresses concern for the safety of the faculty involved in the course and for the students in attendance should you be permitted to interact with the course. Other faculty members are willing to state that they have received threatening statements from you regarding the use of firearms.
 

 Wagner suggests that this statement was based solely on unfounded rumors begun by Dr. Gelderd in a 1992 letter. At deposition, Smith discussed that letter:
 

 Q. You believed that Dr. Wagner did those things [made threats]?
 

 A. I have individuals willing to state under oath that Dr. Wagner made those statements and allegations. I have no
 
 *1332
 
 reason to dispute them and at that point in time, no reason to take action.
 

 Q. Did you believe it in 1992?
 

 A. Yes, I believed that.
 

 Q. Did you believe that Dr. Wagner was a threat to faculty and students back in 1992?
 

 A. I believed that those individuals believed that Dr. Wagner was a threat and that Dr. Wagner had on occasions previously alluded to the use of firearms as a method of dispute resolution.
 

 Later at deposition, Wagner’s counsel suggested that Smith had casually used language that suggested there was a larger group of threatened people than actually existed.
 

 Q. Do you mean it [the statement in Smith’s letter that “Other faculty members are willing to state that they have received threatening statements from you regarding the use of firearms”] might mean “he” instead of “they”?
 

 A. That is conceivable. What I am telling you on the record is that there are a number of individuals who are willing to state either they have felt personally threatened by Dr. Wagner or have firsthand knowledge of Dr. Wagner’s statement and action that led to my conclusion to ask Dr. Wagner to refrain from attending the course.
 

 Hi * Hs * H* Hi
 

 Q. All right, if a person read that and assumed that what it really meant was what it said, that more than one person had received a threatening statement, is that true or not true?
 

 A. I believed that to be true. I believed that there are two or more individuals other than Dr. Gelderd who will testify that they believe Dr. Wagner has made statements which would be interpreted as a threat.
 

 Hi Hi Hi Hi H« Hi
 

 A. I am willing to state that at the time I wrote this statement, I believed Dr. Black to be willing to confirm the statement.
 

 Q. All right, but you hadn’t spoken to him in years about the subject?
 

 A. That is correct.
 

 A defendant’s failure to investigate a statement’s truth is insufficient to show malice.
 
 Schauer,
 
 856 S.W.2d at 449-50 (citing
 
 Mayfield v. Gleichert,
 
 484 S.W.2d 619, 627 (Tex.Civ.App.—Tyler 1972, no writ)). The focus is on Smith’s state of mind at the time of publication.
 
 See Danawala,
 
 14 F.3d at 254. “ ‘Proof of falsity in fact is not enough, nor is proof of a combination of falsehood and general hostility.’ ”
 
 Id.
 
 (quoting
 
 Seidenstein,
 
 769 F.2d at 1104). Wagner has failed to meet his burden to prove actual malice by Smith.
 
 See Duffy,
 
 44 F.3d at 313-14;
 
 Schauer,
 
 856 S.W.2d at 449. Wagner has not presented evidence that Smith seriously doubted the truth of his statement. “Under the actual malice standard, a determinative factor is whether the defendant entertained serious doubts as to the truth of the communication; the privilege is not lost if the defendant actually believed the defamatory statement to be true.”
 
 Duffy,
 
 44 F.3d at 314. At deposition, Smith named two persons other than Gelderd whom he believed could corroborate the fact that Wagner had made threats in the past. Although Smith was unable to identify as many individuals who were actually threatened themselves, his allegedly defamatory statement does not necessarily imply that all the individuals supporting his statement were personally threatened. The fact that Smith failed carefully to check and update the sources of older information about Wagner does not prove that he in any way doubted the verity of his statement.
 

 Because Smith’s statement is protected by a qualified privilege, as well as by the doctrine of official immunity, summary judgment on Wagner’s defamation claim is warranted.
 

 III.
 
 Conclusion
 

 The Defendants’ Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Outstanding issues of material fact exist with respect to Wagner’s claims of disability discrimination under the
 
 *1333
 
 ADA as to events occurring after November 1, 1993, violations of his First Amendment speech rights under 42 U.S.C. § 1983 which relate to events occurring after November 1, 1993, and violations of the Texas Whistle-blower Act with regard to events arising after August 30,1995.
 

 The Defendants are GRANTED summary judgment on Wagner’s claims of disability discrimination under the ADA with regard to events occurring before November 1, 1993, civil rights violations under 42 U.S.C. § 1983 arising prior to November 1, 1993, property interest deprivation under 42 U.S.C. § 1983, violations of the Texas Whistleblower Act as to events occurring prior to August 30, 1995, fraudulent concealment, negligent and intentional infliction of emotional distress, and defamation.
 

 IT IS SO ORDERED.